HENRIETTA V. PARVIS *v.* PHILADELPHIA, W. & B. R. Co.

*Abatement— Witness—Accident at Railroad Crossing—Diligence.*

The right to sustain a personal action for damages to a person did not survive to his representatives at common law, but exists in this state by force of the statute.

As a general thing, the testimony of witnesses who swear positively to a fact is entitled to more weight than those who swear negatively in regard to it.

The terms "ordinary care and diligence," which railroad companies are bound to exercise, when applied to the management of railroad engines and cars in motion, must be understood to import all the care and circumspection, prudence, and discretion, which the peculiar circumstances of the place or caution reasonably required of such company or their servants ; and this will be increased or diminished according as the ordinary liability to danger to others is increased or diminished in the movement or operation of them.

The law imposes upon every person the duty of using ordinary care for his own protection and security against accident; and the care and diligence which he is bound to exercise must be in proportion to the danger to be avoided, which is such care, prudence, and diligence as a reasonably prudent man, under the peculiar circumstances of the case, would exercise to preserve himself from being injured.

(<i>New Castle, May 21, 1889.</i>)

ACTION on the case for damages sustained by the death of plaintiff, who was run over by defendant's cars.

*Charles B. Lore* and *Albert Constable for the plaintiff:*

1. The defendant is bound, in running its engines across the public highway of the country, to exercise reasonable care and diligence to warn travellers upon such highways of the approach of the engine. And what is such reasonable care and diligence, in a particular case, will depend upon the circumstances of the case, to be judged by the jury.

*Continental Company v. Steed,* 95 U. S., 161, 164; *Penn. R. R. Co. v. Coon,* 111 Pa. St., 430, 439; *Longenecker v. Penn. R. R. Co.,* 105 Penn., St., 328, 332; *Bradley v. Boston R. R.,* 2 Cushing, 539, 543; *Linfield v. Old Colony R. R.,* 10 Cushing, 562, 569; *Norton v. Eastern R. R.,* 113 Mass., 366, 368.

2. Notwithstanding the defendant may have complied with the statute of this state, by ringing the engine bell continuously for three hundred yards before passing over the public highway leading into Middletown, it is still the province of the jury to decide whether, under the particular circumstances of the case, such ringing of the bell was sufficient compliance with defendant's duty to give reasonable and timely warning of the approach of its engine to said crossing. And if the jury believe that defendant's engine ran down and killed Dr. Parvis, while lawfully travelling upon a public highway, and that reasonable care, in view of the surrounding circumstances, required that defendant's agents in charge of said engine should have sounded the whistle as a warning of its approach but did not do so, then defendant was guilty of negligence.

Same authorities.

3. The plaintiff is required to prove that there was some negligent act or omission on the part of the defendant company, or its servants, which caused or materially contributed to

cause the death of Dr. Parvis. But she is not bound to go further and prove that Dr. Parvis was himself not guilty of any negligence contributing to his death; and unless and until it has been proved that Dr. Parvis was guilty of some negligent act or omission, which materially contributed to his death, the jury must assume there was no such negligent act or omission.

*Hirst v. Indianapolis R. R.*, 93 U. S., 291; *Hough v. Railway Co.*, 100 U. S., 213; *Dublin, Wicklon & Wexford Ry. Co. v. Slattering*, L. R., 3; Appeal cases at pp., 1169, 1180; *Sshum v. Penn. R. R.* 107 Pa St., 8, 12; *Penn. R. R. v. Weiss*, 87 Pa. St., 447; *Longenecker v. Penn. R. R. Co.*, 105 Pa. St., 328; *Kansas Pacific R. R., Co. v. Pointer*, 14 Kansas, 37; *Prideaux v. City of Mineral Point*, 43 Wisc., 513; *Hill v. New Haven*, 37 Vt., 501; *Smith v. Eastern R. R. Co.*, 35 N. H., 366; *Express Co. v. Nichols*, 33 N. J., (Law,) 434; *Frech v. P. W. & B. R. R. Co.*, 39 Md., 574; *Lynam v. P. W. & B. R. R. Co.*, 4 Houston, 583; *Wharton on Negligence*, Sec 4235.

4. Mere negligence or want of ordinary care and caution upon the part of Dr. Parvis will not disentitle the plaintiff to recover, unless it were such, that but for that negligence or want of ordinary care and caution the misfortune could not have happened.

*Diamond State Iron Co. v. Giles*, Atlantic Rep., 189, 193; *Tuff v. Warman*, 5 C. B. N. S., 573, E. C. L., 94.

3 Appeal Cases, 1173.

5. If the jury shall find a verdict for the plaintiff, then in assessing the damages they are to estimate the reasonable probabilities of the life of the deceased Dr. Parvis and give the plaintiff such pecuniary damages not only for past losses but for such prospective damages as the jury may find that she has suffered or will suffer as the direct consequence of the death of the said Dr. Parvis.

*Dalton v. S. E. Ry. Co.*, 4 C. B. N. S., 296 E. C. L., 93; *Franklin v. S. E. Ry. Co.*, 3 H. & N., 211; *Pym v. G. N. Ry. Co.*, 2 B. & S. E. C. L., 110, 759, S. C., 4 B. & S., 396, E. C. L.,

116   *R. R. Co. v. Barron,* 5  Wall, 90;  *B. & O. R. R. Co., v.*
State, use of Houer, 60 Md., at p. 453.

*Geo. V. Massey* and *Geo. Gray,* for defendant.

COMEGYS C. J., charging the jury :

This case which you are trying is one of the most important,
ones that has ever been presented to a jury in this county.   It has
created a great deal of public interest, not only on account of the
peculiar features of it, but from the fact that it has been conducted
before you by four  men who  certainly have  not their superiors
among us, and one who has a reputation which  has  become much
more extensive than the limits of his own  state.   It has been a
great satisfaction to sit and see this case tried, although the  mental
labor and anxiety and care of mind on the  part of the  court has
been great, to avoid doing or saying anything which might seem to
indicate that they had any  feeling  or judgment in  regard  to this
case, in any form.   It has, nevertheless, been to them one of great
interest, and they have watched its progress from beginning  to end
with  great  satisfaction.   Certainly  the  people  of this state have
reason to be very proud that there are men yet living who can con-
duct cases before jurors with all the ability, skill, and  eloquence of
the best ment of the past  time.   This, as  I  said, is a  very im-
portant case, and I will proceed now  to  deliver the  views  of the
court to you in regard to the law ; prefacing the  statement of  the
law with such remarks in  regard  to the  same as it  would  seem
proper to lay before you, in order that you  may have  your  mind
clear upon the prominent facts and features of the case  which you
are trying.

According to a maxim, as old perhaps as the  system  of com-
mon law itself, no action would  lie by  any  one except the  party
actually injured, to recover damages as compensation for the wrong
committed to his person.   A suit might be brought by such  party
in his life-time, but, unless prosecuted to  a  judgment during  that
period, it absolutely ended when he died.   It did  not  survive, as

the language of the law is, in favor of his personal representatives, —that is, his executors and administrators,—but died with his life. And this was also for a long time the case with respect to actions technically personal, as distinguished from those concerning land or real estate ; and it required a legislative enactment in England, whence the common law is derived, to create, survive, and save in behalf of their personal representatives suits for damages begun by decedents in their life-time, and pending and undetermined at the time of their death. Such an enactment became a part of our system of law, along with the more ancient common law, with the institution of civil society in this colony by our ancestors, and the makers of the constitution of 1792 provided a mode to make such representatives parties, as they did also for making such parties in the case of their decedent, who, in his life-time was a party to such action. Still, with respect to injuries to the person of a decedent, the venerable maxim, that a personal action dies with the person, obtained. Our legislature has, considering the large number of collisions that increasedly occur from the rapid movements of railway engines and trains along roads which cross thoroughfares of travel by wayfaring people, and the fact that, as was oftentimes the case, such collisions resulted in the death of some of those people, passed the following enactment, to be found in our Code, p. 644: " Section 1. That no action hereafter brought to recover damages for injuries to the person by negligence or default shall abate by reason of the death of the plaintiff, but the personal representatives of the deceased may be substituted as plaintiff, and prosecute the suit to final judgment and satisfaction. Sec. 2. Whenever death shall be occasioned by unlawful violence or negligence, and no suit be brought by the party injured to recover damages during his or her life, the widow of any such deceased person, or, if there be no widow, the personal representatives, may maintain an action for and recover damages for the death thus occasioned.

This act includes all injuries to the person, however committed,

but those occasioned by the collisions referred to were the chief ones in the contemplation of the legislature at the session of 1866, when the act quoted was passed. Although sever personal actions of the kind referred to have been brought and preceeded into judgment since the date of the act, yet the one we are now trying is the only one brought, after the death of a party killed by a railroad accident, under the authority of the aforesaid second section. It is by the widow of the deceased, Dr. Parvis, Mrs. Henrietta V. Parvis, to recover damages occasioned by her from the loss of her husband, on account, as she claims, of the negligence and want of care on the part of the defendant, the Philadelphia, Wilmington & Baltimore Railroad Company, in running one of its passenger trains upon and along the railroad operated by it in this county, extending southward through the state. The accident which resulted in the death of the plaintiff's husband happened, according to the testimony before you here, on the night of the 5th of March, 1888, at a place called "Frogtown Crossing," about half a mile above Middletown, and where the state road or common highway, between Middletown and this city, is crossed (going southward) at an acute angle, with its apex towards that place. It occurred about half-past 7 o'clock of the night of that day, while the south-bound passenger train was moving along the railroad on about its usual time. Dr. Parvis was driving along this common highway in his York wagon, with the top up, on his way home to Middletown, and in proceeding to the Frogtown crossing had as a companion the witness Oliver J. Jamison, from a point about 100 yards north of his factory (which you have heard spoken of by witnesses, sometimes as the "Phosphate Factory," sometimes as the "Bone-Factory," and sometimes as the "Bone-Mill,") and had driven to a point about the same distance south of it. Here they parted company, Dr. Parvis saying that he must get home; that he wanted to get his supper and be fixed up a little before he went to the entertainment in the hall that evening; and that he would see him after the entertainment was over. He went off, as

the witness says, in a little jog trot, and that he himself kept on in a walk. This is the substance of his statement of the meeting of Dr. Parvis and himself upon the highway, and their progress along it. If there is no mistake upon the part of Mr. Jamison to the distance from the point of separation below the factory to the factory itself, they were at that time, as appears by the plots in evidence, something less than 300 yards from the fatal spot where Dr. Parvis lost his life,—the factory being 1,111 feet at its south corner from the spot where the collision occurred. The highway was at a very acute angle with the railroad until near the railroad crossing, when it became less so, curving eastwardly. This is shown by the plot.

Mr. Jamison stated that he drove in a walk until he came to a point which he indicated on the plot, very near a house shown thereon, and that during that time he neither saw nor heard any train. He stopped there, however, and he says that a moment afterwards he saw and heard the train; that it was coming past him, and that was the first he had seen or heard of it; that he had stopped and listened for it, and that he could not see it until it passed by him. He also said he stopped but a very short time before he heard it, and that he was both listening and looking. When it had passed, he went on towards Middletown, without knowing that any accident had happened. Mr. Jamison further said, in his cross-examination, that the night was very cold, the road rough, and it was dark. In further cross-examination, he said he stopped north of the small house, and that he was watching for the train; that his view was not unobstructed, as there was a hedge eight or ten feet in height, which he could not see over; that he did not see the train until was opposite to him, nor hear it, except that he might have done so an instant before it came past him. Upon this point of not hearing the train, the plaintiff produced to you eight other witnesses, who stated that they did not hear the train, nor the whistle, nor the bell, at any time from the time when they first saw that train, which was up about the phosphate factory, until it came

down to the crossing, where this lamentable accident occurred. As this is a very material statement, of course it became necessary for the defendant to fortify his position with rebutting testimony, and it has produced before you the testimony of the engineer and the fireman who were in or upon the engine, or in the cab, as I believe they call it, at the time this occurred; and also three other witnesses, two of them colored men, and the other Mrs. Daly, the wife of Mr. James Daly, who was one of the nine witnesses of the plaintiff, to prove, according to their best knowledge, that there was a whistle blown and bell rung. Of these witnesses, two of them (the engineer and the fireman) said positively in their testimony that the bell was commenced to be rung just after they left Armstrong corner, and that it rung continuously until they reached this crossing, and that when they came to the crossing the whistle was also blown, in view of the apparent accident before them. These colored men both said that they heard this whistle and this bell ringing continuously from a point about the phosphate factory down to the railroad crossing; and Mrs. Daly states, also, she was with her husband at the time, and very emphatically states that she heard it all the time ringing until this accident occurred.

Now, gentlemen, you have on one side five witnesses who testified positively to their knowledge of the ringing of the bell; on the other, you have the testimony of nine witnesses, most of whom, I believe, were upon the train, or at least the chief portion of them, I think, that they heard no bell whatever, nor any signal given until this accident occurred. One point made by the learned counsel for the defendant is this: That in a case where the testimony is positive on one part, and is negative on the other,—that is, as in this case, that where parties did hear, and that they did not hear,—that in estimating this case, and in treating it, as you must necessarily do, you must give more weight to the testimony of those witnesses who swear positively to the fact; and I believe they went so far as to ask us to instruct you that the positive testimony in such a case is the testimony alone to be relied on. Well,

we are not willing to do that, we are willing to leave this matter entirely to you, taking into consideration the fact that one certainly of these witnesses may be supposed, without doing violence to anything that is right, to have spoken under the influence of some bias in the matter. And why? Because he was the engineer of this train, and his duty was according to the instructions of the company, which prevails in all cases, to take all necessary care and caution to warn people upon the approach of trains to crossings, and particularly to crossings of great peril and great danger like this was. Then, if he neglected his duty in any respect, he would be responsible to the company, not only for his place, if they saw proper to remove him from it, but he would also be responsible to the company in damages for breach of his duty, if the company were liable for damages in this action. In regard to the other four witnesses on the part of the defendant, who apparently are without the influence of any bias whatever, one of them has been discredited by the testimony of a witness produced on the part of the plaintiff,—that is, the man Turner; but, as in all cases of that kind, you are to consider whether he spoke the truth or not. A man may be discredited by one witness, and yet that does not necessarily invalidate his testimony, but it does throw upon it a suspicion, if the impeaching witness is a man who holds a rank in a community that Cyrus Tatman does in this. The witness Ryan, who was the fireman on that train, and the colored man and Mrs. Daly, you have them on one side, and on the other, as I said, nine witnesses, most of whom, I think, were upon the train, that stated to you they heard no bell or whistle or warning at all. We cannot instruct you that you are to take the testimony of those witnesses who swore to a positive fact, and not those who swear they did not hear, a fact which they have proven; but we state this as a general rule and general principal of law, and it is an instruction which I am constantly in the habit of giving to juries,—as a general thing, the testimony of witnesses who swear positively to a fact is entitled to more weight than those who swear negatively in regard to it. I

do not think it is necessary to go any further.   It is for you to be-
lieve which of all these witnesses you choose.

A great many authorities have been cited, yet the case is with-
in a very narrow point.   I will now proceed to lay before you the
law applicable to the cases of collision by the running of trains,—
the trains of railroad companies.   And there is no occasion to go out-
side of our own courts to search for any such cases.   A case was tried
in this court at the May term, 1870, wherein the law was most in-
telligently laid down by my predecessor, and it is sufficient for this
case, and for other cases invoving the same or similar circumstances,
and in fact in all cases where negligence in running trains is im-
puted and contributory negligence is set up as a defense.   In this
case negligence in driving the train down to and over the public
highway crossing at Frogtown, with respect to the non-using of ap-
propriate signals or warnings of danger to people on the highway,
is charged against the defendant, and that by reason of it the hus-
band of the plaintiff lost his life ; which contention is opposed, on
the part of the defendant, by the charge that the deceased himself
was guilty of negligence, or want of proper caution on his part, and
that such contributed to the fatal accident that befell him.   Then
we have here imputation of negligence by the defendant, and that
it caused the fatal disaster, and answer to it that the deceased con-
tributed to it by want of proper diligence, which is negligence on his
part.   This case to which I have referred—that of *Patterson v.
Railroad Co.*, 4 Houst., 103—gives the law completely applicable
to that case, and, as we think, to this case also.   The Chief Justice
said, speaking for the Court,—and this is as good an exposition of
the law applicable to both sides of the case of the collision as we
are acquainted with,—" that the terms ' ordinary care and diligence,'
when applied to the management of railroad engines and cars in
motion, must be understood, however, to import all the care and
circumspection, prudence and discretion, which the peculiar circum-
stances of the place or occasion reasonably require of such servants;
and this will be increased or diminished according as the ordinary

liability to danger   *   *   *   to others is increased or diminished in the movement and operation of them." He then goes on to apply the law thus stated to the case then before the Court. Further on he says : " But, on the other hand, it is equally well settled, as a principle of law, that the plaintiff was also bound, at the same time, to use ordinary prudence, care, and diligence to avoid the accident and injury which occurred to him on that occasion ; because it is not only an instinct of our nature and a dictate of reason, but a duty which the law imposes with respect to the legal responsibilities of others upon every person, no matter how he may be engaged, or what may be his position, to use ordinary care for his own protection and security against such accidents, and the care and diligence which he is bound to exercise must be in proportion to the danger to be avoided." Then adding, to explain his meaning : " That is to say, he is bound to use such care, prudence and diligence as a reasonably prudent man, under the peculiar circumstances of the case, would exercise, to preserved himself from being injured."

Now, I make bold to say that a clearer view or exposition of the law of negligence as affecting railroad companies, and those injured by collisions from the movements of their trains, has never been given. It is so clear as to be comprehensible to the most ordinary mind. It is that railroad companies must use due care with respect to the lives and persons of individuals who, in the pursuit of their lawful business, will incur danger from their trains, and that such persons shall, on their part, use like care to avoid such danger. Due care in the case of the companies means, ordinarily, the timely employment of efficient signals or warnings, notifying the approach of trains to public places, such as highway crossings, etc., and in the case of individuals due circumspection, or listening, or both, when practicable, to avoid collision ; and the greater the peril to the individual the greater the duty of care by the company, and of prudent and due caution on the part of the individual. At places of great danger great care must be taken by both parties. This,

after all, is but common sense, the force of which must be evident to every one. By applying this law to the facts of this case, as they have been laid before you by the respective parties, you will be able, I think, to reach a conclusion satisfactory to yourselves, and in the interest of sound adjudication.

Now, it was the duty of the defendant in this action, on that night, as well as at all other times, to make use of all the usual and appropriate means, as bell and whistle, to warn wayfarers who might be passing along the highway, intending to cross this road at the dangerous locality of Frogtown, of the approach of the south-bound train; and it was in no wise absolved from that duty by the act of assembly, which has been stated as operating relief from such duty, for that act is not with respect to the railroad companies, but was intended, as clearly appears from its terms, to compel engineers, or others having, at the time, charge of trains, to perform the duty they were bound to as servants or agents of their employers. The act inflicts punishment upon such persons by indictment and fine, or imprisonment, or both. The intent of the act was to punish engineers and others for not doing their duty, and not to relieve the companies from the common-law duty of taking the usual means to warn people of danger; but neither the neglect of the engineer on that night to obey the statute, nor that of the company to do its duty on that occasion, if you believe from the testimony such neglect existed at all, relieved the deceased in any respect from the duty on his part to take all the care which an ordinarily prudent man would have taken, under the same circumstances, to secure himself against danger from the train, which was then expected to pass at that time, and which from his frequent travel upon that highway he must be taken to have known might go by at any instant. The train did come to the crossing on time, as was to be expected, and might have been seen by looking up the road in time to avoid the collision, if he had looked for it; for there was a clear space of 37 feet before the crossing was reached, and, according to

its rate of passage, it took the train about 20 seconds to traverse the rails from the factory to the fatal crossing.

According to the law of this State, as laid down in this Court in the case of *Lynam v. Railroad Co.*, 4 Houst., 583, the deceased was bound, before he reached that Frogtown crossing, to look for that train. We can never know whether he looked or not. If he did before he got on that crossing, he must have seen it. If he did see it, he must be supposed to have taken the risk of being able to get over the crossing in time. If he did not, then unfortunately he would seem to have failed to exercise the care and caution of an ordinarily prudent man. Whether he did fail or not is a matter for you, in view of all the facts in the case. Now, it is in proof before you by the engineer of the defendant who was running the train that night that at the time the deceased was struck by the train they were moving at the rate of 35 to 40 miles an hour. The speed before the train reached Armstrong's corner was shown to be usual, —30 miles an hour. It was afterwards accelerated, and, by the time reached the Frogtown crossing, it was, according to Engineer Grubb, going from 35 to 40 miles an hour. It may have attained that increased speed at the factory, only 1,111 feet north of the crossing. Now, it was stated yesterday, by the defendant counsel who last addressed you, that the time required by the train, moving at her usual rate of speed,—30 miles an hour,—would have been about 20 seconds, or one-third of a minute. The decrease of time, by reason of increase of speed, is a matter of calculation, which you can make for yourselves. Now, taking this fact of decrease of time between the factory and the crossing in connection with the position of Dr. Parvis' buggy at the time it was struck, in would seem that, but for that increase of the speed of the train, the deceased would have passed the crossing in safety; for, according to the testimony of the fireman, the deceased was proceeding at a good rate of speed. Now, we are not prepared, as a matter of law, to say to you that the duty devolved upon the deceased, on that occasion, to anticipate and protect himself against increased speed of the train; but we

leave it to you to say whether, taking all the facts and circumstances into consideration, the deceased was guilty, in you opinion, of any want of diligence and due care on that occasion. If you think he was not, then the plaintiff is entitled to your verdict; if you think he was, then she is not. If you find for the plaintiff, she would seem to be entitled to a verdict for such reasonable sum as will compensate her, according to the statement of items contained in the six prayers of instructions. The prayer that I refer to is this: "If the jury shall find a verdict for the plaintiff, then, if she is entitled to damages, they are to estimate the reasonable probabilities of the life of the deceased, Dr. Parvis, and give the plaintiff such pecuniary damages, not only for past losses, but for such prospective damages as the jury can find she has suffered, or will suffer, as the direct consequence of death to the said Dr. Parvis."

Jury disagreed.