## THE SAGINAW AND THE HAMILTON.

### In re CLYDE S. S. CO.

#### (District Court, S. D. New York. August 2, 1905.)

1. ADMIRALTY—ACTION FOR WRONGFUL DEATH UNDER STATE STATUTES—MEASURE OF DAMAGES.

   In enforcing in a court of admiralty a right of action for wrongful death in a collision on the high seas, which is given by the statute of the state to which the vessels belonged, the measure of damages is governed by the law of such state.

2. COLLISION—RECOVERY FOR DEATH OF MEMBERS OF CREW—EFFECT OF VESSEL'S FAULT.

   The first officer of a vessel sunk in a collision is not chargeable with negligence because of her improper navigation, where he acted in all that he did under the orders of the master; and the fact that such vessel as well as the other was in fault for the collision does not affect such officer or members of the crew so as to preclude a recovery of full damages for their deaths from the fund paid in by the other vessel in proceedings for limitation of liability.

3. SAME—PLEADING.

   A claim for damages by reason of the death of a person in collision, filed in proceedings in admiralty for limitation of liability by the administratrix of the deceased, but based on a state statute which gives the right of recovery to the widow, is sufficient to authorize a recovery where it discloses that the claimant is also the widow of the deceased, and an amendment making the claim in that capacity may properly be allowed.

4. WRONGFUL DEATH—MEASURE OF DAMAGES—USE OF LIFE TABLES.

   Mortality tables prepared for life insurance purposes afford little aid in determining the duration of life in actions to recover damages for wrongful death, and especially where the deceased was a colored person.

In Admiralty. Suits for limitation of liability on account of collision. On exceptions to commissioner's report.

Wing, Putnam & Burlingham, for the Old Dominion Steamship Company.

Robinson, Biddle & Ward, for the Clyde Steamship Company.

Convers & Kirlin, Hunt, Hill & Betts, A. Leo Everett, and Arthur L. Fullman, for various claimants.

ADAMS, District Judge. These are exceptions to the commissioner's report made in consequence of the decision of this court on the merits of the applications of the owners of the steamships

Hamilton and Saginaw to limit their liability. See In re Clyde S. S. Co., etc. (D. C.) 134 Fed. 95.

The report is as follows:

"The interlocutory decree directed me:

'(1) To take proof as to the amount, validity and priority of all claims for property losses to which exceptions shall be filed as aforesaid, and to report upon the total damages sustained by the two colliding vessels, as well as by the loss and destruction of the cargo and effects upon the Saginaw.

(2) That as to such claims as are already filed to recover for personal injuries and for loss of life of the persons who may have perished by or in consequence of said collision, the Commissioner report the amount of damages in each case with all evidence taken, or introduced, before him, touching such claims so as to enable the court thereafter to determine the amount of damages.

(3) That such report also state the facts and amounts showing the proper ultimate apportionment and adjustment of all collision claims and liabilities, as between the two petitioners herein.'

I. All of the claims for loss of cargo have been compromised and settled and the total amount thereof is stipulated before me to be the sum of........................................................ $110,633 39

All of the claims for loss of personal effects, and all of the claims for personal injuries, including the claim for the death of Eliza Jones, S. B. Kenney, administrator, have been settled and the amount thereof has been stipulated before me in the sum of.. 9,679 06

making a total of........................................ $120,312 45

All of these amounts were paid by the Old Dominion Steamship Company or by the underwriters for its account.

One-half of that amount is chargeable against the Clyde Steamship Company .................................................. $ 60,156 22

In addition the Clyde Steamship Company should bear one-half of the damage to the steamship 'Hamilton'. The amount thereof, including demurrage, is stipulated at the sum of $11,083.08, one-half of which is........................................... 5,541 54

making a total charge against the Clyde Steamship Company of $ 65,697 76
Brought forward ........................................ $ 65,697 76

On the other hand, it is stipulated that the total loss of the steamer 'Saginaw' is the sum of $90,000, with one-half of which the Clyde Steamship should be credited, namely.................. 45,000 00

leaving a balance due the Old Dominion Company of.......... $ 20,697 76

Releases from various claimants, together with the statements and receipts of the adjustment and settlement of the cargo claims are in evidence before me giving in detail the names of the shippers, the values of their respective shipments, and the amount paid in settlement and adjustment of their claims.

The result of this adjustment is that there are left pending before me only the claims for loss of life.

The following are the death claims:

(1) Primus Gilmore, as administrator of Alfred Gilmore, deceased.. $10,200
(2) Alvin Lee Joseph, as executor under the will of Edward S. Goslee, deceased ......................................... 20,000
(3) Sallie T. Morris, as administratrix of William Morris, deceased.. 15,000
(4) Mary Swanson, as administratrix of Peter Swanson, deceased.. 12,000
(5) Mary Anderson, as administratrix of Sarah Elam, deceased.... 15,000
(6) Joseph Lawson, as administrator of Edmund Page, deceased.... 8,100
(7) Luther Hawley, as widower of Mary Hawley, deceased......... 10,000
(8) Maurice G. Belknap, as administrator of Laura Hawley, deceased 10,000

In assessing damages, and in passing upon the question of contributory and imputed negligence, the law to be applied is the law of Delaware if the courts of that state have pronounced upon the question; if they have not, the federal law is to be applied.

It will be remembered that the various claimants are in this court in invitum. These are proceedings to limit liabiⅼity and the court has issued an injunction against proceedings in any other forum, or by any other proceedings than the present. It is therefore manifestly just that the claimants should not be deprived of any benefits which they might have received, in case the law of Delaware is more favorable to them than the law of the Federal Courts; but on the other hand if there are any principles of law enunciated by the Delaware courts more favorable to the steamship than the law as announced in the Federal Courts, the ship may likewise claim the benefit of them.

That the law of Delaware applies is settled in the case of Northern Pacific Company against Babcock, 154 U. S. 190, 14 Sup. Ct. 978, 38 L. Ed. 954. In that case the contract of employment was made in Montana and the accident occurred in that state; the action was brought in Minnesota; there was a difference in the statutes of the two states as to the amount which the plaintiffs in such cases might recover. The court said, (page 197, 154 U. S., page 980, 14 Sup. Ct., 38 L. Ed. 958):

'The question which those assignments of errors present is, was the amount of damage to be controlled by the law of the place of employment and where the accident occurred, or by the law of the forum in which the suit was pending?'

And at page 199 of 154 U. S., and page 981 of 14 Sup. Ct., 38 L. Ed. 958:

'We think there was no error in holding that the right to recover was governed by the lex loci, and not by the lex fori.'

In Slater v. Mexican National Railroad Co., 194 U. S. 120, 24 Sup. Ct. 581, 48 L. Ed. 900, the court said at page 126 of 194 U. S., and page 583 of 24 Sup. Ct., 48 L. Ed. 900, as follows:

'Therefore we may lay on one side as quite inadmissible the notion that the law of the place of the act may be resorted to so far as to show that the act was a tort, and then may be abandoned, leaving the consequences to be determined according to the accident of the place where the defendant may happen to be caught. * * *'

And on page 127 of 194 U. S., and page 583 of 24 Sup. Ct., 48 L. Ed. 900:

'As the cause of action relied upon is one which is supposed to have arisen in Mexico under Mexican laws, the place of the death and the domicile of the parties have no bearing upon the case.'

In Railroad Co. v. Babcock, supra, the court at page 197 of 154 U. S., and page 980 of 14 Supt. Ct., 38 L. Ed. 958, quoted with approval from Herrick v. Minneapolis & St. L. R. Co., 31 Minn. 11, 16 N. W. 413, 47 Am. Rep. 771, the following:

'In such cases the law of the place where the right was acquired, or the liability was incurred, will govern as to the right of action; while all that pertains merely to the remedy will be controlled by the law of the State where the action is brought.'

In the case of Boston and M. R. Co. v. McDuffey, 79 Fed. 934, at page 937, 25 C. C. A. 247, at page 250, the court held as follows:

'The question whether or not an injured servant shall have the right of action for damages against a negligent master, when such master's negligence has been committed through the instrumentality of another servant, is one which deals with the right of action itself, not with the remedy.'

See, also, Maher v. Union Pacific, D. & G. R. R. Co., 106 Fed. 309, at page 310, 45 C. C. A. 301, at page 302, where the court applied the law of the place where the collision of railway trains occurred, as settling the liability of the defendants to the plaintiffs for their negligence. See, also, Stewart v. Baltimore & Ohio R. R. Co., 168 U. S. 445, 18 Sup. Ct. 105; 42 L. Ed. 537.

The cases of the Steamboat Company v. Chase, 16 Wall. 522, 21 L. Ed. 369, and City of Norwalk (D. C.) 55 Fed. 98, cited in the brief for the Steamship do not negative the conclusions above stated. The former case came up to the Supreme Court of the United States by writ of error to the Supreme Court of Rhode Island, in whose courts a right of action for death upon the tidal waters between Providence and Newport, within Rhode Island, sustained by the state courts, was likewise sustained by the Supreme Court, the conclusion being that the right of action given by the ₊state statute for such a death, does not interfere with the exclusive jurisdiction of the District Court con-

ferred by the Constitution and the judiciary acts. While in the City of Norwalk (D. C.) 55 Fed. 98, the court held that the state statute does not create a cause of action but that it creates a new right and liability, and the court in that case held that the law of imputed negligence of the state applied so far as to defeat the right of the deceased to recover against his own ship.

The law of Delaware, in regard to the law of damages, is stated in the case of Williams v. Walton & Whawnn Co., 9 Houston, 322, 32 Atl. 726, as follows:

'If the jury shall find a verdict for the plaintiff, then if she is entitled to damages, they are to estimate the reasonable probabilities of the life of the deceased, and give the plaintiff such pecuniary damages, not only for past losses but for such prospective damages as a jury can find she has suffered or will suffer, as the direct consequences of the death of said deceased.'

In Maxwell, administrator, v. Wilmington Street Railway Company, 1 Marvel, 199, 40 Atl. 945, the court said, at page 208 of 1 Marvel, and at page 947 of 40 Atl.:

'The measure of damages is such a sum as the deceased would probably have earned in his business during life, and would have gone to his next of kin, taking into consideration the age of the deceased, his ability, disposition to labor, habits of living and expenditure.'

In the case of Reed v. Queen Anne's R. R. Co. (Del. Super.) 57 Atl. 529, the court, at page 532, said:

'If you find for the plaintiff it should be for such a sum of money as will reasonably compensate her for any and all damages that she has sustained or may hereafter sustain by reason of the death of her said husband, basing your verdict upon the number of years the deceased would probably have lived had he not been so killed. In measuring damages in this case you are not to be governed by what would probably have been the gross earnings or income of the deceased, but by what portion of the gross earnings or income the plaintiff would probably have received from the deceased as his wife, if he had lived.'

In Cox v. Wilmington S. R. Co. (Del. Super.) 53 Atl. 569, the court said:

'If you find for the plaintiff it should be for such a sum of money as will reasonably compensate her for any and all damages that she has sustained or may hereafter sustain by reason of the death of her said husband; basing your verdict upon the number of years the deceased would probably have lived, and have given to her the benefits of his society and support as such husband.'

In Croker v. Pusey & Jones Co. (Del. Super.) 50 Atl. 61, the court said:

'If you find for the plaintiff, it should be for such sum as, in your judgment, under the evidence in this cause, the deceased would probably have earned in his business during life and left as his estate, taking into consideration the age of the deceased, his ability and disposition to labor and habits of living and expenditures.'

See, also, Parvis v. P. W. & B. R. R. Co. (Del. Super.) 17 Atl. 702; Wilcox, admr. v. W. C. Railway, 2 Pennewill, 157, 44 Atl. 686; Tully v. P. W. & B. R. R. Co. (Del. Super.) 50 Atl. 95; Neal v. W. & N. C. Elect. Ry. Co. (Del. Super.) 53 Atl. 338.

I do not find that the rule as stated in the courts of the United States differs materially from the Delaware rule. See The Oceanic (D. C.) 61 Fed. 339 at page 363; Lindstrom v. The International Navigation Company, 117 Fed. 170 at page 175, (reversed on another point [C. C. A.] 123 Fed. 475); In re Humboldt Lumber Manufacturers' Association (D. C.) 60 Fed. 428, 444; Harkins v. Pullman Palace Car. Co. (C. C.) 52 Fed. 724, affirmed 55 Fed. 932, 5 C. C. A. 326; Ross v. Texas & Pac. Railway Co. (C. C.) 44 Fed. 44; Nickerson v. Bigelow (D. C.) 62 Fed. 900; Cheatham v. Red River Line (D. C.) 56 Fed. 248; Boden v. Demwolf (D. C.) 56 Fed. 846; Ladd v. Foster (D. C.) 31 Fed. 827; Central Trust Co. v. Wabash, etc. (C. C.) 34 Fed. 616; Whiton v. Chicago, etc., 2 Biss. 282, Fed. Cas. No. 17,597; O. L. Hallenbeck (D. C.) 119 Fed. 468; The Elizabeth (D. C.) 114 Fed. 757; Voelker v. C., M. & St. P. R. R. Co. (C. C.) 116 Fed. 867; The Dauntless (D. C.) 121 Fed. 420; Killien v. Hyde (D. C.) 63 Fed. 172; Middleton v. Compagnie Transatlantique Co. (D

C.) 110 Fed. 1001; Memphis Consolidated Gas and Electric Co. v. Letson (C. C. A.) 135 Fed. 969.

Of the eight persons, claims for whose deaths are before me, Goslee and Swanson were white; Morris, Gilmore, Page, Mrs. Elam, Mrs. Hawley and Laura Hawley were colored. They were all upon the Saginaw and were drowned. Swanson, Gilmore, and Mrs. Hawley and her child were passengers; the other four were members of the crew. In the cases of Morris and Swanson objection is made to the allowance of any amount upon the ground that each left a widow and that the action is brought by the personal representatives. The Statute of Delaware (13 Del. Laws 1866-67, pp. 28, 29, c. 31; 31 Del. Laws 1901, p. 500, c. 210) provides that 'the widow or widower of such deceased person, or if there be no widow or widower, the personal representatives may maintain' &c. The interlocutory decree, however, in this case directs me as follows:

'2. That as to such claims as are already filed to recover for personal injuries and for loss of life of the persons who may have perished by or in consequence of said collision, the commissioner report the amount of damage in each case, with all evidence taken or introduced before him touching such claims, so as to enable the court thereafter to determine the amount of damages'.

In the Swanson case the claim as presented reads as follows: 'The claimant, Mary Swanson, administratrix of the estate and widow of Peter Swanson, deceased, alleges as follows' and then recites that she is the widow of Swanson and also that letters of administration have been issued to her.

In the case of Morris, the claim is in the form of an affidavit by Sallie T. Morris which recites that she is the widow and executrix of William Morris, and that she claims her damages not reciting the capacity in which she asserts the claim. The court, by order entered May 27, 1905, permitted the filing of the claim, nunc pro tunc, in an amended form.

I am in considerable doubt as to whether I have the right, under the order of reference herein, to reject these claims for the reason stated by the proctors for the Hamilton, and hence, I have considered the amount of damages leaving the matter of the right of the claimants to assert their claims for consideration by the court.

All the claims for death were asserted against the Hamilton; the claims for the death of William Morris, Edward S. Goslee, Mrs. Hawley and Laura Hawley were also asserted against the proceeds of the Saginaw.

I. The Claim of Primus Gilmore as Administrator &c. of Alfred Gilmore. Alfred Gilmore was 18 years of age at the time of his death. He was a waiter in constant employment and received from $5.50 to $6 a week in addition to board and lodging. He was unmarried and left surviving him his father, Primus Gilmore, who files the claim as administrator, his mother and several sisters and brothers. He had contributed to some degree to the support of his father who also received assistance from others of the children, and who was a farmer and teamster at Fayetteville, North Carolina. The father was 59 years of age and the children were from about 25 years of age to 5 years. Alfred Gilmore, according to the proof before me, was steady and industrious and of good habits but not of a saving disposition. He sent to his father small sums of money amounting to perhaps $50 in one year. His expectation of life, according to the mortality tables, 20 Am. & Eng. Encyc. 885, was a little over 43 years. I think the sum of Three thousand five hundred dollars ($3,500) should be allowed upon this claim.

II. The Claim of Alvin Lee Joseph as Executor Under the Will of Edward S. Goslee, Deceased. Goslee was a man of 60 years of age and the first officer of the Saginaw. He was in vigorous health, a man of good habits, of thrifty disposition, having accumulated real estate and personal property of the value of $10,000 or $11,000. His wages were $67 per month, including an allowance for board. His expectation of life was 15 years.

The proctors for the Hamilton asked for the dismissal of this claim upon the grounds: 1st, that Goslee, claimant's testator, was negligent; and 2nd, on the ground that his estate can not recover because of the negligence of

Tunnell, master of the vessel, and of the other officers concerned in her navigation. I find as a fact that Goslee was not personally negligent and that the only negligence was that of Tunnell, the master of the vessel; and inasmuch as the claim is asserted practically only against the Hamilton, the proceeds of the Saginaw being so small as to be negligible, I find as a matter of law that the defense is not available against the Hamilton, even if it could be raised in behalf of the Saginaw.

I find that the claim should be allowed in the sum of Seven thousand five hundred dollars ($7,500).

III. The Claim of Sallie T. Morris as Administratrix of William Morris, Deceased. William Morris was the steward on board the Saginaw, a position which he had held for some time. He was forty years of age and had been married a year and ten months before his death. His wages were $35 a month and his board and lodging on board the steamer for which the company made an allowance of $17 per month, making his earnings in reality $52 per month. His wife, shortly before his death, had opened a restaurant in Richmond, and Morris was accustomed regularly to send money to her; she testifies that he sent her $50 a month. He was industrious, sober and of good habits. He left no children. His expectation of life was twenty-eight years. I am of opinion that she should be allowed Four thousand five hundred dollars ($4,500).

IV. The Claim of Mary Swanson as Widow and Administratrix of Peter Swanson. Swanson lived in Philadelphia and was a shoemaker by trade, but occasionally went to sea. He had been in hospital in Norfolk in consequence of an accident on the Saginaw some two months before he started to return by the same ship to Philadelphia. He came as a passenger. He was 42 years of age and his earnings were about $600 per year. His wife, and his son of 12 years of age, had been dependent upon him for support. He appears to have been a man of good health and of sober and industrious habits. His expectation of life was twenty-seven years. I think the claim should be allowed in the sum of Four thousand two hundred and fifty dollars ($4,250).

V. The Claim of Mary Anderson as Administratrix, &c. of Sarah Elam. Sarah Elam was the stewardess on the Saginaw. She was 53 years of age and a widow, and the administratrix is her daughter; there are two other daughters, both unmarried, the youngest of the three being twenty years old. Her wages were $10 per month, which with the allowance above stated, amount to $27 per month. The three children were more or less dependent upon her for support. She had been thrifty and had saved some money. Her expectation of life was nineteen years. I allow this claim in the sum of Two thousand five hundred dollars ($2,500).

VI. The Claim of Joseph Lawson as Administrator of the Estate of Edmund Page, Deceased. Page was the first cook on the Saginaw, his earnings being from $500 to $600 per year; he had dependent upon him for support his mother, Lucretia Stokes, well along in years, who, since his death, has fared poorly. His age was between 31 and 35 years, and his expectation of life was thirty-two years. He had been in the habit of sending his mother from $13 to $15 a month. He left also a sister and a brother. I allow this claim in the sum of Four thousand two hundred and fifty dollars ($4,250).

VII. The Claim of Luther Hawley, as Widower of Mary Hawley, Deceased. Mary Hawley was sixteen years of age at the time of her death. She was the wife of Luther Hawley, who was a laborer earning from $7 to $13 a week, and she took care of his housekeeping arrangements. She was healthy and vigorous, and her expectation of life was forty-five years. I think the claim should be allowed in the sum of Three thousand five hundred dollars ($3,500).

VIII. The Claim of Maurice G. Belknap as Administrator of the Estate of Laura Hawley, Deceased. Laura Hawley was an infant in arms, only about a month old, but according to the testimony, was a healthy and vigorous child. Her expectation of life was about 36 years. I allow Seven hundred and fifty dollars ($750) on this claim.

A tabular statement of the ages, expectations, yearly wages, occupations and amount allowed by me, is as follows:

| Name. | Age. | Expectation. | Yearly Wages. | Occupation. | Amount. |
|---|---|---|---|---|---|
| Gilmore | 18 | 43 | $360 | Waiter | $ 3,500 |
| Goslee | 60 | 15 | 924 | Chief Officer | 7,500 |
| Morris | 40 | 28 | 624 | Chief steward | 4,500 |
| Swanson | 42 | 27 | 600 | Shoemaker | 4,250 |
| Sarah Elam | 53 | 19 | 324 | Stewardess | 2,500 |
| Page | 35 | 32 | 550 | Cook | 4,250 |
| Mrs. Hawley | 16 | 45 | | Wife of Luther Hawley | 3,500 |
| Laura Hawley | 1 month | 36 | | Infant | 750 |

Total ........................................................................................ $30,750

One half of this amount, namely $15,375, should be chargeable against the Saginaw; which, together with the amount of $20.697.76 due the Old Dominion Company as already stated, makes a balance due of $36,072.76.

I have not credited the amount of the proceeds of the Saginaw in this report in the thought that this amount, together with the apportionment of the costs &c., should be a matter for the final decree."

The exceptions are 27 in number but the proctors for the exceptant, the Old Dominion Steamship Company, state in their brief that they raise four general questions, as follows:

"1st. The error of the Commissioner in following the law of Delaware, not only as to the liability of the petitioners, but even in the method of ascertainment of the amount of damages.

2d. The error of the Commissioner in dealing with the claims of the crew of the Saginaw, (a) as to the personal negligence of the mate Goslee, and (b) as to the right of any members of the crew to recover against the Hamilton more than 50 per cent. of the damages otherwise recoverable by them.

3d. Regarding the claims presented by administratrices, and not by widows.

4th. Generally in the assessment of damages following reported verdicts of juries, based on mortality tables, and not according to Admiralty precedents."

**1.**

The argument for the exceptions in this connection is substantially that while the court may, under its ruling that the vessels were parts of the territory of Delaware, determine if an action lies and as to the point of time when a suit may be brought, its award should not be governed by the views of Delaware juries but should follow recognized precedents in the admiralty courts. As I read the decisions, they do not determine that the verdicts rendered by juries shall in any way be binding or influential upon the decision of this court in reaching the amounts which should be awarded as damages but merely that the measure of damages shall be ascertained according to the law of the place. The courts in admiralty must determine the amounts in practically the same way as juries would reach them, i. e., follow the ordinary methods in assessing the damages which they would instruct juries to adopt if the cases were tried in that way, but the amounts found by juries in particular cases can not be regarded in any way as precedents for other cases. It was recently said by the Circuit Court of Appeals for the Fifth Circuit, Quinette v. Bisso (C. C. A.) 136 Fed. 825, 841:

"Administering a Louisiana statute as to a wrong occurring within its borders, involving its own citizens, we think we should be governed in the measure of damages by analogy to the decisions of its highest court under similar circumstances."

## 2.

It appears that the mate Goslee was not personally negligent with respect to the speed of his vessel. That was regulated by the master, who was responsible for the general conduct of his ship and it would be anomalous to hold the chief officer personally liable for acts committed under the instructions of the master. The latter came to the vicinity of the wheel some time prior to the collision and although he was not there just before the contact, having gone forward to obtain a better view, nevertheless he was giving orders for the movements of his vessel up to the end.

As to the right of the representatives of any member of the Saginaw's crew to obtain against the Hamilton more than 50% of the damages otherwise recoverable, it appears that the decedents were not so identified with their vessel that they could be regarded as participating in her faults and for that reason be excluded from any part of a recovery. The commissioner's determination in this respect is apparently correct.

## 3.

The claims as originally presented were made by the libellants as administrators. Subsequently some of the parties, when apparently necessary, presented their claims as widows and amendments were allowed to that effect. It is objected that the amendments were too late under the Delaware statutes, as they provide, (29 Delaware Laws of 1897, c. 594, p. 712):

"Section 1. That from and after the passage of this act no action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of one year from the date upon which it is claimed that such alleged injuries were sustained."

Seemingly, the original libels were sufficient to properly present the claims to the court. No harm, at least, was done by the amendments. I think the rights of the parties have been preserved.

## 4.

This has been partly considered above and it only remains to take up the question of the use of mortality tables.

Such tables are very useful in insurance matters, but seem to afford little real aid in determining the duration of life in such cases as are now presented and I think the commissioner has erred in adopting them for the purpose of absolutely determining the probable duration of the lives of many of the persons, whose deaths have to be considered here. Judge Simonton has said in this connection, The William Branfoot (D. C.) 48 Fed. 914, 917:

"Counsel for libellant press upon the consideration of the court tables, prepared by insurance agents, showing the expectancy of life at various ages,— 35 years if libellant is 30, and 32 years if he is 35,—and ask that he be allowed the sum of his daily wages for this period. This would be securing for libellant compensation for a certain period when we are dealing with the most uncertain thing in the world,—human life. I have no confidence in, and less respect for, these tables made up by insurance agents, in which, of course, large allowance must be made for heavy commissions, expenses, and profit."

139 F.—58

And this is especially true where colored persons are concerned. Mr. Hoffman in his "Race Traits and Tendencies of the American Negro" says (pp. 57, 58):

"The great difference in the expectation of life for the two races is brought out with scientific accuracy in the following life table, abstracted from the census of 1880. No official life tables have been compiled since that year.

Comparative Expection of Life for White and Colored Persons in Four Southern Cities in 1880.[1]

| Ages. | Washingt'n, D. C. 1880 | | Baltimore, Md. 1880 | | Charleston, S. C. 1880 | | New Orleans, La. 1880 | |
|---|---|---|---|---|---|---|---|---|
| | Whites. Years. | Col'd. Years. | Whites. Years. | Col'd. Years. | Whites. Years. | Col'd. Years. | Whites. Years. | Col'd. Years. |
| 0 | 42.36 | 25.25 | 38.18 | 23.26 | 38.34 | 21.82 | 38.10 | 25.56 |
| 5 | 51.85 | 44.48 | 51.72 | 44.32 | 48.10 | 40.68 | 47.88 | 40.76 |
| 10 | 48.71 | 42.13 | 49.66 | 42.40 | 44.24 | 37.96 | 44.16 | 37.50 |
| 20 | 40.42 | 35.34 | 41.50 | 36.62 | 36.24 | 31.60 | 35.80 | 30.63 |
| 30 | 33.64 | 30.22 | 34.74 | 30.64 | 30.08 | 27.14 | 29.35 | 26.98 |
| 40 | 27.36 | 24.63 | 28.05 | 24.68 | 24.60 | 21.51 | 23.78 | 22.49 |
| 50 | 21.06 | 18.90 | 21.27 | 18.92 | 18.80 | 15.72 | 18.62 | 17.78 |
| 60 | 15.01 | 13.70 | 15.01 | 13.42 | 13.14 | 11.04 | 13.58 | 13.22 |
| 70 | 9.98 | 9.19 | 10.24 | 8.37 | 8.81 | 7.90 | 9.43 | 8.90 |
| 80 | 6.70 | 6.37 | 7.14 | 6.38 | 6.59 | 5.94 | 6.73 | 6.46 |

[1] Census of 1880, Vol. XII, pages 773-783.

This table shows the expectation of life at ten selected ages for both races, in representative southern cities, bringing out in a forcible way the difference in the vitality of the two races. In the District of Columbia a white person at the age of thirty for instance would have a chance of living about three and a half years longer than a colored person of the same age; in Baltimore about four years, and in New Orleans two and a half years. But this is an age at which the general mortality is very low for both races. At all the earlier ages the differences are of course much greater. The excessive mortality at the very early ages of course affects the mortality at the older ages by reducing the differences between the two races. For the periods of old age the expectation of life is almost the same for both races."

I have compared the figures given with those of the census and find them to have been correctly extracted.

Under such circumstances, it does not seem to have been proper for the commissioner to use the mortality tables to the extent he has. The foregoing considerations lead me to modify his conclusions with respect to the claims as follows:

1. Primus Gilmore, as administrator of Alfred Gilmore.

The deceased was a young colored waiter on the Saginaw. The claimant was held to be entitled to $3,500. I think in view of the fact that the deceased was earning but small wages, with board, and did not, nor was likely to, contribute much to his father's support, that the amount allowed was excessive and that the sum of $2,000 will amply compensate the claimant for any loss that he may have suffered by the death.

2. Alvin L. Joseph, executor of Edward S. Goslee.

The deceased was a white man and the chief officer of the Saginaw. He was 60 years of age and earning $67 per month with board. The claimant was allowed $7,500. I think the commissioner ruled correctly as to the claimant being entitled to recover

the full loss arising from the death, but in view of the decedent's age and limited earning capacity, I consider that the award should be reduced to $6,000.

3. Sallie T. Morris, as administratrix and widow of William Morris.

The deceased was a colored steward on the Saginaw, earning $35 per month and board worth $17 per month, making his earnings practically $52 per month. The claimant was allowed $4,500. It is not probable that the deceased would have been able to send his wife much of his earnings. In any event, she was able to and did earn her own living, partially at least. I think the allowance should be reduced to $3,000.

4. Mary Swanson, as administratrix of Peter Swanson.

The deceased was 42 years of age. He was a shoemaker by trade earning about $600 per year. On this occasion he was making a trip on the Saginaw as a passenger. He had a wife and son, the latter, about 12 years of age, dependent upon him for support. The claimant was allowed $4,250. Barring consideration of the decedent's expectation of life as shown by the mortality tables and adopted by the commissioner, the deceased was not in sound physical condition, having been injured while working on the Saginaw as a sailor. It does not appear that he worked at his trade very steadily and in view of his impaired physical condition, I think the commissioner's award is excessive. It should be reduced to $2,750.

5. Mary Anderson, as administratrix of Sarah Elam.

The deceased was a colored stewardess on the Saginaw. She was 53 years of age and earned $10 per month with board. The latter was worth to her about $17 per month. She left three children who were more or less dependent upon her for support. The claimant was allowed $2,500. In view of the age of the deceased and her small earning capacity, I think the award was excessive and should be reduced to $1,500.

6. Joseph Lawson, as administrator of Edmund Page.

The deceased was the first cook on the Saginaw earning $500 or $600 per year. His age was between 31 and 35 years. He left a mother and a brother and sister surviving him. He had been in the habit of sending his mother from $13 to $15 per month, but was irregular in doing so. She was between 60 and 70 years of age. An allowance of $4,250 was made. It seems that no one but his mother had any expectation of aid from him and in view of her advanced years and the small and irregular amounts that he contributed to her support, I think the award should be reduced to $3,000.

7. Luther Hawley, as widower of Mary Hawley.

The deceased was but 16 years of age. She was the wife of the claimant, a laborer earning from $7 to $13 per week. He very

quickly married again. He had a child by the deceased born about the 1st of April, 1903. An allowance of $3,500 was made. The widower's loss was not great and the award seems to be excessive. It should be reduced to $2,000.

8. Maurice G. Belknap, as administrator of Laura Hawley. The deceased was an infant about a month old but healthy and vigorous. The value of this life is exceedingly problematical. I think the award is excessive and it should be reduced to $400.

The death claims as allowed are as follows:

1. Primus Gilmore, as administrator of Alfred Gilmore, deceased, $ 2,000.

2. Alvin L. Joseph, as executor of Edward S. Goslee, deceased, $ 6,000.

3. Sallie T. Morris, as administratrix and widow of William Morris, deceased, $ 3,000.

4. Mary Swanson, as administratrix of Peter Swanson, deceased, $ 2,750.

5. Mary Anderson, as administratrix of Sarah Elam, deceased, $ 1,500.

6. Joseph Lawson, as administrator of Edmund Page, deceased, $ 3,000.

7. Luther Hawley, as widower of Mary Hawley, deceased, $ 2,000.

8. Maurice G. Belknap, as administrator of Laura Hawley, deceased, 400.

$20,650.

The exceptions are overruled save as here indicated and the report as modified will be confirmed.