**James McMILLAN,**

v.

**The CITY OF NEW YORK, as Owner and Operator of the M/V Andrew J. Barberi, et al., Defendants.**

**Nos. 03–CV–6049, 08–CV–2887.**

United States District Court, E.D. New York.

Oct. 14, 2008.

Gina M. Venezia, Wayne D. Meehan, John Joseph Walsh, Freehill, Hogan & Mahar, New York, NY, Kenneth S. Sasmor, Marie Bonitatibus, Philip Pizzuto, New York City Law Department, New York, NY, for the City of New York.

## ORDER ON EXCLUSION OF "RACE" AS A CRITERION FOR COMPUTING DAMAGES

JACK B. WEINSTEIN, Senior District Judge:

Edward T. Cooper, Evan Torgan, Megan K. Gleason, Mitchell K. Aaron, Torgan & Cooper, New York City, for James McMillan.

## TABLE OF CONTENTS

I. Introduction ................................................. 248

II. Factual Unreliability of "Race"-Based Statistics .............................. 249
   A. "Race" as Biological Fiction ............................................ 249
   B. Unreliability of "Racial" Categories ...................................... 251
   C. Socio–Economic Status and "Race" ...................................... 251
   D. Legal Decisions on "Race" .............................................. 253
      1. Future Earnings ...................................................... 253
      2. Work–Life Expectancy ................................................ 254
      3. Life Expectancy ..................................................... 254

III. Unconstitutionality of "Race" as a Criterion for Assessing Damages .............. 255
   A. Equal Protection ...................................................... 255
   B. Due Process .......................................................... 255

IV. Application of Law to Facts ............................................. 256

V. Conclusion ................................................. 256

## I. Introduction

James McMillan, the claimant, was rendered a quadriplegic in the crash of a ferryboat operated negligently by the City of New York. *In re City of New York*, 475 F.Supp.2d 235 (E.D.N.Y.2007), *aff'd*, 522 F.3d 279 (2d Cir.2008). He sued for pain, suffering and cost of necessary medical care. *See McMillan v. City of New York*, 2008 WL 4287573 (E.D.N.Y. amended Sept. 19, 2008) (findings of fact and law assessing damages).

A critical factor in determining claimant's damages is his estimated life expectancy. In a trial before the court and an advisory jury, statistical evidence was introduced suggesting that a spinal cord-injured "African–American" was likely to survive for fewer years than persons of other "races" with similar injuries. *See* Trial Tr. pages 723–24.

The parties characterized claimant as an "African–American."

The question posed is whether such "racially" based statistics and other compilations may be relied upon to find a shorter life expectancy for a person characterized as an "African–American," than for one in the general American population of mixed "ethnic" and "racial" backgrounds. The answer is "no." "Racially" based life expectancy and related data may not be utilized to find a reduced life expectancy for a claimant in computing damages based on predictions of life expectancy. As indicated below, the unreliability of "race" as a predictor of life expectancy as well as normative constitutional requirements of equal treatment and due process support this conclusion.

The court's findings of fact and conclusions of law disregarded all "race"-based computa-

tions of life expectancy and applied predictions for the general male population, and particularly those suffering from quadriplegia. *See* Trial Tr. pages 800–810, 1062–67; *McMillan v. City of New York*, 2008 WL 4287573 (E.D.N.Y. amended Sept. 19, 2008). Properly rejected in predicting life expectancy were "racially" based statistics.

## II. Factual Unreliability of "Race"-Based Statistics

In the United States, there has been "racial mixing" among "Whites," "Africans," "Native Americans," and individuals of other "racial" and "ethnic" backgrounds for more than three and a half centuries. *See, e.g.,* Annette Gordon–Reed, *The Hemingses of Monticello: An American Family* 660 (2008) (Thomas Jefferson fathered children with his "mixed blood" slave Sally Hemings. "[T]he choices the children of Sally Hemings and Thomas Jefferson made would separate their lines forever. Three would live in the white world, and one would remain in the black world."); Gregory Howard Williams, *Life on the Color Line: The True Story of a White Boy Who Discovered He Was Black* (1996). In *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (approving separation of "Whites" and "Blacks" on the grounds of "social" inferiority) the plaintiff was apparently 7/8th "White" and 1/8th "Black." *See also Dred Scott v. Sandford,* 60 U.S. 393, 19 How. 393, 15 L.Ed. 691 (1856) ("racial" inferiority of "Blacks," who could not be citizens). Clear-eyed observers of the American scene scoff at the use of "blood" in characterizing "race." *See, e.g.,* Mark Twain, *Pudd'nhead Wilson* (1894) ("White" and "Black" babies who looked "White" taken home by wrong mothers and raised inadvertently in "wrong 'racial' categories").

Statistical reliance on "race" leads to such questions as whether Plessy would have been categorized today as "African–American" for life expectancy purposes. In a more recent example, "racially" characterizing for statistical purposes in a negligence lawsuit the current Democrat Party presidential candidate, born of a "White" American mother and an "African" citizen of Kenya, would be considered absurd by most Americans. *See* Colm Tóibín, *James Baldwin & Barack Obama,* N.Y. Rev., Oct. 23, 2008, at 18 ("When Obama was a child, he wrote, 'my father … was black as pitch, my mother white as milk.' "). Reliance on "race"-based statistics in estimating life expectancy of individuals for purposes of calculating damages is not scientifically acceptable in our current heterogeneous population. As indicated below, "race" is largely a social construct inappropriate in assessing damages in a negligence suit.

### A. "Race" as Biological Fiction

Franz Boas, the great Columbia University Anthropologist, pointed out that "[e]very classification of mankind must be more or less artificial;" he exposed much of the false cant of "racial" homogeneity when he declared that "no racial group is genetically 'pure.'" *Quoted in* Keay Davidson, *Franz Boas* in 3 American National Biography 83 (1999). *See also The Shaping of American Anthropology, 1883–1911, A Franz Boas Reader* 273 (George W. Stocking, Jr., ed., 1974) ("if we base our inferences entirely on the results of anatomical study, it would seem that there is no reason to believe that the bulk of the people constituting two distinct races might not be approximately on the same level" as to mental ability); Scott L. Malcomson, *One Drop of Blood: The American Misadventure of Race* 277 (2000) ("within the premodern written records of, globally speaking, light-skinned people, references to white people as white people, as a race, are remarkably scarce"); Orlando Patterson, *Rituals of Blood: Consequences of Slavery in Two American Centuries* 155–58, 165–66 (1998) (intermarriage); *The Concept of Race* xi (Ashley Montagu, ed., 1964) ("the biological concept of race has become unacceptable to a growing number of biologists"); Douglas S. Massey & Nancy A. Denton, *American Apartheid, Segregation and the Making of the Underclass* 9 (1993) ("Our fundamental argument is that racial segregation—and its characteristic institutional form, the black ghetto—are the key structural factors responsible for the perpetuation of black poverty in the United States."); James C. King, *The Biology of Race* 146 (2d ed.1981) ("estimates of the proportion of genetic material from white ancestry in American blacks range all the way from a few per cent [sic] to more than 50 percent").

An anthropologist who has written extensively on "race" and its evolution in American society notes:

> Despite legal and social attempts to prohibit intermarriage or intermating, some genetic mixture still occurred. In response, the United States had to resort to a fiction to help preserve the distinctiveness of the White/Black racial (and social) dichotomy. North Americans define as Black anyone who has known African ancestors, a phenomenon known and introduced by historians over half a century ago as the "one drop rule"... There is mounting historical evidence that this modern ideology of race took on a life of its own in the latter half of the 19th century ... [a]s a paradigm for portraying the social reality of permanent inequality as something that was natural.

Audrey Smedley & Brian D. Smedley, *Race as Biology Is Fiction, Racism as a Social Problem is Real*, 60:1 Am. Psychologist 16, 20 (2005) (internal citations omitted) (referred to herein as an article by Professor Smedley). Professor Smedley finds that "[t]he ideology [of "race"] arose as a rationalization and justification for human slavery at a time when Western European societies were embracing philosophies promoting individual and human rights, liberty, democracy, justice, brotherhood, and equality." Smedley, *supra*, at 22. She cites Robert Moore, a sociologist from the University of Liverpool, who "observed that in the mid–1800s, a consensus emerged that human cultural differences were of a permanent kind, expressing underlying natural differences." *Id.* at n. 15. Professor Moore quotes Alexis de Tocqueville, who as an early observer of American life was among the first to recognize this conception of "race," writing that "the existence of innate and immutable racial characteristics is to be regarded with skepticism and theories founded upon such doctrine are mere rationalizations for slavery and other forms of racial oppression." *Id.* (internal citations omitted).

Professor Smedley cautions against scientific investigations that focus on justifying the differences between "racial" groups:

> Racialized science, with its emphasis on identifying immutable differences between racial groups, can be expected only to maintain and reinforce existing racial inequality, in that its adherents indirectly argue that no degree of government intervention or social change will alter the skills and abilities of different racial groups. The disproportionate representation of some "racial" groups (e.g., African Americans, American Indians) among lower socioeconomic tiers can therefore be explained as an unavoidable byproduct of human evolution. Yet reinforcing this widely held social stereotype of racial inferiority risks limiting individual human potential, in that individuals' abilities and opportunities would likely be assessed in relation to their racial group.

*Id.* at 24.

DNA technology finds little variation among "races" (humans are genetically 99.9% identical), and it is difficult to pinpoint any "racial identity" of an individual through his or her genes. *Id.* at 19. International gene mapping projects have only "revealed variations in strings of DNA that correlate with geographic differences in phenotypes among humans around the world," the reality being that the diversity of human biology has little in common with socially constructed "racial" categories. *Id.* at 21–22.

While "race" may be a social construct, many policymakers and courts insist that it "remains a significant predictor of ... access to societal goods and resources." *Id.* at 22. "Racial" and "ethnic" disparities in quality of health care, for example, remain substantial across a broad range of medical services. *Id.* at 23. But those "disparities are associated with socioeconomic differences and tend to diminish significantly and, in a few cases, to disappear altogether when socioeconomic factors are controlled." *Id.* By allowing the use of "race"-based life expectancy tables, which are based on historical data, courts are essentially reinforcing the underlying social inequalities of our society rather than describing a significant biological difference.

## B. Unreliability of "Racial" Categories

In 1977, the Office of Management and Budget (OMB) issued Statistical Policy Directive Number 15, "Race and Ethnic Standards for Federal Statistics and Administrative Reporting." *See* U.S. Census Bureau, Population Division, Racial and Ethnic Classifications Used in Census 2000 and Beyond, http://www.census.gov/population/www/socdemo/race/racefactcb.html (last visited Oct. 13, 2008). The directive established four "racial" categories ("American Indian or Alaskan Native," "Asian or Pacific Islander," "Black," and "White") for federal legislative, programmatic and administrative purposes. *Id.* The OMB revised these standards in October of 1997, creating five groups instead of four by splitting "Asian" and "Native Hawaiian or Other Pacific Islander." *Id.* The 2000 census also added a sixth "racial" set, "Some Other Race," and allowed responders to choose more than one category. *Id.* The catch-all of "Some Other Race," which was meant to "capture responses such as Mulatto, Creole, and Mestizo," also included a write-in option. *Id.*

Despite the 2000 census' more detailed self-categorization system, demographic studies that use pre–2000 census data continue to define "race" by using the 1977 OMB directive. *See, e.g.,* Christopher J.L. Murray et al., *Eight Americas: Investigating Mortality Disparities across Races, Counties, and Race–Counties in the United States,* 3:9 PLoS Med. 1513, 1515 (2006); Martha Chamallas, *Questioning the Use of Race–Specific and Gender–Specific Economic Data in Tort Litigation: A Constitutional Argument,* 63 Fordham L.Rev. 73, 82–83 (1994) ("The tables presented in [a practitioner's text for calculating lost earning capacity] are the P–60 Series (for 1977–90) from the Current Population Reports published by the United States Bureau of the Census ... As was the case for most government data collections for these periods, race is reduced to either black or white; there is no separate breakdown for other racial/ethnic groups.").

Life expectancy tables are based on historical data and thus largely rely on the OMB's former archaic "racial" analysis. This means that the tables frequently employed by courts in determining tort damages fail to account for the nuanced reality of "racial" heritage in the United States today.

After hundreds of years of sexual mixings, there continues to be "no socially sanctioned in-between classification" of "race" in America. Smedley, *supra,* at 20. Even researchers investigating the differences between the life expectancies of "Black" and "White" Americans admit that the "presently available summary measures such as age-adjusted mortality and estimated life expectancy are crude" and "may mask special successes and/or problems for specific age categories/diseases or in specific local populations." Robert S. Levine et al., *Black–White Inequalities in Mortality and Life Expectancy, 1933–1999: Implications for Healthy People 2010,* 116 Pub. Health Rep. 474, 482 (Sept.-Oct.2001). *See also* Murray, *supra,* at 1521 ("The most important limitation of the data used for our analysis is that reported race in the census, used for population estimates, may be different from race in mortality statistics, where race may be reported by the family, the certifying physician, or the funeral director."). Even if reliance on "race"-based statistical projections made factual sense in the United States, available statistics do not appear to account for what might be called "blood ratios," in view of the American reality of long-term "racial" mixing.

## C. Socio–Economic Status and "Race"

Putting aside the question of the fallacy of treating all "dark-skinned" Americans as completely different from "light-skinned" Americans in predicting life expectancy, socio-economic factors have a large role in influencing length of life. While many sociologists, epidemiologists, and other researchers have noted "[t]he broad influence of race/ethnicity and socioeconomic position on functional status, active life expectancy, and mortality," Arline T. Geronimus et al., *Inequality in Life Expectancy, Functional Status, and Active Life Expectancy across Selected Black and White Populations in the United States,* 38:2 Demography 227, 227 (2001), the influence of socio-economic factors is often masked by "race." *See* Levine, *supra,* at 482 ("race itself may be largely a surrogate for

other factors, especially differences in environmental exposures"). Reliable studies have found that "[t]he relationships between socioeconomic position or race/ethnicity and health may be modified by geographic influence and community conditions that contextualize and structure these relationships." Geronimus, *supra,* at 227. As one group of researchers has cautioned, "while race-based mortality ratios and absolute risks are important, there are clear limitations to their use as indicators of health," including the appropriateness and reliability of the "racial" and "ethnic" categories used in statistical analysis. Levine, *supra,* at 481–82.

The impact of socio-economic status (SES) on life expectancy has long been recognized. *See* Joseph J. Sudano & David W. Baker, *Explaining U.S. racial/ethnic disparities in health declines and mortality in late middle age: The roles of socioeconomic status, health behaviors, and health insurance,* 62 Soc. Sci. & Med. 909, 918 (2006) ("Our results are also consistent with previous studies that have found large 'direct' (or residual) effects of SES on health that were not explained by differences in health behaviors."). Aside from "baseline health," the next "dominant explanation for the worse health outcomes for blacks and Hispanics was SES." *Id.* "In contrast, health insurance and health behaviors explained little of the racial/ethnic differences in health outcomes." *Id.; see also* Murray, *supra,* at 1522 ("Important research in the past few decades has illustrated the critical role of individual and community-level socio-economic factors, be it in absolute or relative terms, in health outcomes"); Lloyd B. Potter, *Socioeconomic Determinants of White and Black Males' Life Expectancy Differentials, 1980,* 28:2 Demography 303, 304 (1991) ("There is a long-standing consensus that a negative relationship exists between socioeconomic conditions and the levels of mortality experienced by a population.").

More detailed investigations into the life expectancy gap between "White" and "Black" Americans have shown that life expectancy varies within "racial" groups by economic characteristics and geography. *See* Geronimus, *supra,* at 244 ("Our analyses revealed heterogeneity in length and quality of life *within* the black and the white populations with respect to their communities' economic characteristics and, to some extent, the location of their residence."). Given the significant impact of socio-economic factors, it is natural for courts to be concerned with the use of life expectancy tables that ignore important distinctions such as education, place of residency, and employment, collapsing all members of a "racial" group into a single number. Gross statistical tables do not answer the question: how does the life expectancy of well-off or middle-class "African-Americans" compare to that of poor "African–Americans?"

In a national study of twenty-three local areas, researchers found that "African American residents of advantaged urban areas have substantially higher life expectancies than their poor urban counterparts; in some cases their life expectancies approach the white national average." Geronimus, *supra,* at 241. That study also found that "White residents of urban poor areas have mortality profiles comparable to those of black residents of poor rural areas and blacks nationwide," and "somewhat worse than residents of relatively advantaged black urban areas." *Id.* at 234–35. In fact, "African–Americans" residing "in the advantaged population of New York City fare as well as whites nationwide." *Id.* at 233.

In studies targeting cardiovascular diseases (CVD), researchers found that after controlling for risk level, "there was no consistent pattern in CVD mortality differences for Black and White men according to income level. As shown in other research, the higher overall CVD mortality rate among Black men than among White men was largely explained by differences in zip code area incomes and risk factor levels." Avis J. Thomas et al., *Race/Ethnicity, Income, Major Risk Factors, and Cardiovascular Disease Mortality,* 95:8 Am. J. Pub. Health 1417, 1421 (2005).

When determining tort damages based upon an injured individual's future life span and potential needs, consideration must be given to the fact that changing a person's socio-economic status may have an impact

upon his or her life expectancy. While studies have found that expanding health insurance alone would not greatly impact the life expectancy or morbidity of individuals, it may well be that elevating a group of individuals from a lower socio-economic class to a higher one would change their overall cause-of-death structure and enhance their health and lifespan. Major causes of death in "African–American" populations include homicide, HIV, unintentional injuries, and other factors associated with poverty and low socio-economic status. *See generally* Sam Harper et al., *Trends in the Black–White Life Expectancy Gap in the United States, 1983–2003,* 297:11 J. Am. Med. Ass'n 1224 (2007); *see also* Potter, *supra,* at 304 ("Improvement of socioeconomic conditions is associated with a change from a cause-of-death structure characterized by infectious and parasitic diseases toward one characterized by degenerative disease … such a shift will lead to higher life expectancy.").

The findings of the studies cited above reinforce the conclusion that despite a documented gap in life expectancy between "Black" and "White" Americans, the simple characterization of individuals as "Black" or "White" is not only misleading, it risks masking the complex interactions between a host of genetic and socio-economic factors. While some researchers have suggested that higher socio-economic position may not impact "African–American" health as directly as other populations (due to stress-related diseases potentially linked to structural racism), Geronimus, *supra,* at 228, this is not reason for courts to enforce the negative impacts of lower socio-economic status while ignoring the diversity within populations.

## D. Legal Decisions on "Race"

A 1905 decision by a federal court in New York relied on "race"-based statistics and "racial" categories in reducing damages in an admiralty case. *The Saginaw and The Hamilton,* 139 F. 906 (S.D.N.Y.1905); *see* Jennifer B. Wriggins, *Damages in Tort Litigation: Thoughts on Race and Remedies, 1865–2007,* 27 Rev. Litig. 37, 53–57 (2007) (discussing the case). Two steamships collided, resulting in the deaths of some passengers and crewmembers. *See In re Clyde S.S. Co.,* 134 F. 95 (S.D.N.Y.1904) (decision on limitation of liability in the same case). Wrongful death actions were brought for six "Colored" and two "White" persons killed in the accident. *The Saginaw* at 139 F. 910. Rejecting the use of standard mortality tables to predict the life expectancies of all the deceased, the court cited census data summarizing differences in "White" and "Colored" life expectancies in justifying its reduction of awards. *The Saginaw* at 139 F. 913–14. At that time census respondents did not have the option of selecting more than one "race" to identify themselves. *See* Part II.B, *supra.* Professor Jennifer B. Wriggins found that "on average [the *Saginaw* court] lowered the awards for the deaths of blacks ten percent more than the awards for the deaths of whites and [the court] slashed three of the awards for blacks by forty percent or more." Wriggins, *supra,* at 56. *See also* Marc Galanter, *Bhopals, Past and Present: The Changing Legal Response to Mass Disaster,* 10 Windsor Yearbook of Justice 151, 157–59 (1990) (describing the Hawk's Nest Tunnel disaster in early 1930s West Virginia in which over 700 unprotected laborers were victims of acute silicosis and settlements ranged from $30 for a single "Black" to $1600 for a "White" Family); Monograph, *Individual Justice in Mass Tort Litigation* 7 (1995) (same).

It should be noted in assessing *The Saginaw* that the case was decided shortly after *Plessy, supra,* approving "racial" segregation of "African–Americans." *Plessy's* "racial" basis was entirely rejected by *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *The Saginaw* has no precedential value.

### 1. Future Earnings

Courts are increasingly troubled by "race"- and gender-based figures for calculating loss of future income. The district court in *United States v. Bedonie* noted that "surprisingly the reported cases have almost completely neglected the question" of whether to use sex- and "race"-neutral statistics. 317 F.Supp.2d 1285, 1315 (D.Utah 2004), *aff'd sub nom, United States v. Serawop,* 505 F.3d

1112 (10th Cir.2007). After receiving an expert report (for restitution purposes) that reduced the estimate of lost income based on the fact that a victim was "Native American," that court directed recalculation without regard to "race" or gender. *Id.* at 1313–14. Avoiding reaching any constitutional questions, the court chose to "exercise its discretion in favor of victims of violent crime and against the possible perpetuation of inappropriate stereotypes," especially "where the defendants have deprived their victims of the chance to excel in life beyond predicted statistical averages." *Id.* at 1319. The court ultimately utilized gender- and "race"-neutral figures in its findings. *Id.* at 1321–22.

One court refused to use "racial" statistics in calculating tort damages for loss of future income when the plaintiff was half "Black" and half "White." *Wheeler Tarpeh–Doe v. United States*, 771 F.Supp. 427 (D.D.C.1991). The defendant argued that the wage earnings projections for "Black" men were the appropriate figures for the plaintiff, whose mother was "White" and father was "Black." *Id.* at 455. Apparently "race"-based life expectancy figures were not introduced in the case. *Id.* at 456. The court held it "inappropriate to incorporate current discrimination resulting in wage differences between the sexes or races or the potential for any future such discrimination into a calculation for damages resulting from lost wages." *Id.* at 455. It used "the average earnings of all persons." *Id.* at 456; *see also* Laura Greenberg, *Compensating the Lead Poisoned Child: Proposals for Mitigating Discriminatory Damage Awards*, 28 B.C. Envtl. Aff. L.Rev. 429, 447 (2001) (arguing that "race"-based economic statistics "reinforce the status quo of racial disparities" and "propel[ ] race to the forefront of predictions about individual achievement"; advocating use of "race"-neutral statistics).

Canadian courts have refused to use gender-specific wage calculations in determining damages. *See, e.g., Walker v. Ritchie*, 119 A.C.W.S. (3d) (Ont.Sup.Ct. J. Jan. 3, 2003) (using statistical figures which reflected the entire population).

### 2. Work–Life Expectancy

In an action for damages by an injured seaman, the plaintiff presented statistics on work-life expectancy modified to exclude "race" as a factor; the defendant challenged the increased work-life expectancy that resulted. *Theodile v. Delmar Systems, Inc.*, 2007 WL 2491808 at *8 (W.D.La.2007). The district court refused to upset the jury's award in the "race"-neutral amount suggested by plaintiff's expert. *Id.* Another district court rejected an expert calculation that reduced a female tort victim's estimated working life by 40% based on a historical statistic about the number of years females average in the workforce. *Reilly v. United States*, 665 F.Supp. 976, 997 (D.R.I.1987), *aff'd*, 863 F.2d 149, 167 (1st Cir.1988).

In administering the September 11th Victim Compensation Fund, Special Master Kenneth R. Feinberg based estimations of remaining years of work-life on the victim's age, using statistics for the general population of active males in the United States for all claimants and ignoring "racial" differences. September 11th Victim Compensation Fund of 2001, 67 Fed.Reg. 11,233, 11,238 (Mar. 13, 2002) (codified at 28 C.F.R. pt. 104); *see generally* Kenneth R. Feinberg, *What is Life Worth?* (2005).

### 3. Life Expectancy

In the context of Title VII, the Supreme Court noted that while "[a]ctuarial studies could unquestionably identify differences in life expectancy based on race or national origin, as well as sex," Congress has outlawed classifications based on "race," national origin, and sex. *City of Los Angeles, Dep't of Water and Power v. Manhart*, 435 U.S. 702, 709, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). Thus, "[e]ven a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply." *Id.* at 708, 98 S.Ct. 1370. *See also* Jill Gaulding, *Race, Sex, and Genetic Discrimination in Insurance: What's Fair?*, 80 Cornell L.Rev. 1646, 1659 & n. 86 (collecting state statutes forbidding "race" classifications by insurers). "Racial" statistics present an especially strong argument for exclusion, since, as already noted, the

question of "race" is ambiguous, whereas gender is generally conceded.

## III. Unconstitutionality of "Race" as a Criterion for Assessing Damages

### A. Equal Protection

For half a century the Supreme Court has rejected on equal protection grounds "race"-based discrimination. *See, e.g., Parents Involved in Community Schools v. Seattle School Dist. No. 1,* —— U.S. ——, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007) (allocating students to particular schools based on "race" unconstitutional); *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (redistricting based on "race" impermissible); *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) (consideration of "race" in child custody decision unconstitutional despite possibility that societal "racial" biases might affect child); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) ("race"-based restrictions on marriage unconstitutional); *Brown, supra* (abolishing segregation in public schools); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (applying rationale of *Brown* to federal government). *See also, e.g.,* Richard Kluger, *Simple Justice* (2d ed.2004); Jack Greenberg, *Crusaders in the Courts* (1994); Jack Greenberg, *Race Relations and American Law* (1959); Benjamin N. Cardozo Lecture: *The Role of Judges In A Government Of, By, and For the People* at 477–541 (2007).

As Professor Martha Chamallas notes, "when experts rely on race or gender-based statistics to calculate tort damages, we tend not to notice the discrimination and to accept it as natural and unproblematic." *Civil Rights in Ordinary Tort Cases: Race, Gender, and the Calculation of Economic Loss,* 38 Loy. L.A. L.Rev. 1435, 1442 (2005). "Racial" classifications of individuals are "suspect categories," *see United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), meaning that state action in reliance on "race"-based statistics triggers strict scrutiny. *See, e.g.,* Chamallas, *Civil Rights in Ordinary Tort Cases: Race, Gender, and the Calculation of Economic Loss, supra,* at 1441; *cf.* Charleen Hsuan, *Note Medicaid Coverage for Race-Based Drugs,* 41 Colum. J. L. & Soc. Probs. 443 (2008) (arguing that strict scrutiny under equal protection would apply to state Medicaid agency decisions to deny off-label coverage for FDA-approved "race"-based drugs). Judicial reliance on "racial" classifications constitutes state action. *See Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 620–28, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (permitting peremptory jury challenges based on "race" is state action violating equal protection); *Shelley v. Kraemer,* 334 U.S. 1, 14–21, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (state action in judicial enforcement of restrictive covenants based on "race"); *see also* Chamallas, *Questioning the Use of Race–Specific and Gender–Specific Economic Data in Tort Litigation: A Constitutional Argument, supra,* at 106 ("By conceding the relevance of race-based or gender-based data through its admission into evidence ... the judge necessarily leads the jury to believe that gender and race are legally permissible factors and thus cannot be said to be neutral on the issue.") Equal protection in this context demands that the claimant not be subjected to a disadvantageous life expectancy estimate solely on the basis of a "racial" classification.

### B. Due Process

There is a right—in effect a property right—to compensation in cases of negligently caused damage to the person under state and federal law. *See Martinez v. State of California,* 444 U.S. 277, 282, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) ("[a]rguably" a tort cause of action created by a State constitutes "a species of 'property' protected by the Due Process Clause" and there is a federal "interest in protecting the individual citizen from state action that is wholly arbitrary or irrational"); *see also* John C.P. Goldberg, *The Constitutional Status of Tort Law: Due Process and the Right to a Law for the Redress of Wrongs,* 115 Yale L.J. 524 (2005) (constitutional right to a body of tort law for the purpose of redressing private wrongs); Benjamin N. Cardozo Lecture: *The Role of Judges In A Government Of, By, and For the People* at 495–506 (2007) (same).

By allowing use of "race"-based statistics at trial, a court would be creating arbitrary and irrational state action. "[T]he form and content of statistical evidence is shaped by the requirements of the substantive law." David C. Baldus & James W.L. Cole, *Statistical Proof of Discrimination* 10 (1980). Were the court to apply an ill-founded assumption, automatically burdening on "racial" grounds a class of litigants who seek compensation, there would be a denial of due process. *Cf. Brinkerhoff–Faris Trust & Savings Co. v. Hill*, 281 U.S. 673, 680, 50 S.Ct. 451, 74 L.Ed. 1107 (1930) ("federal guaranty of due process extends to state action through its judicial ... branch of government").

The legal system does not work fairly and with due process if one class of litigants is unduly burdened in litigation through the application of inappropriate "race"-based statistics. Where, as in the instant case, no attempt was made to justify the use of "racial" statistics by the City, the due process rights of the defendant cannot be said to have been affected. *See McMillan v. City of New York*, 2008 WL 4181695 (E.D.N.Y. Sept.3, 2008) (City was given the opportunity to brief and address the issue and did not do so).

## IV. Application of Law to Facts

There is no factual basis for discriminating against this claimant by finding a reduced life expectancy based upon "race." That conclusion is particularly sound in the instant case where the damages awarded are designed to extend claimant's life by providing him with the best medical and other care— more than the equivalent of what the average American quadriplegic could expect.

Constitutional normative doctrine also supports excluding "race"-based statistics. "[A]ny decision to use a group-based projection into the future as the basis for a damage remedy also involves normative judgments about the relevant frame of reference and the rate of future change." Wriggins, *supra*, at 56. The American reality reflects that "people do not fall naturally into discrete racial groupings" and "[l]egal classifications of race tend to be unrefined and often reflect ignorance of differences within a given category." Chamallas, *Questioning the Use of Race–Specific and Gender–Specific Economic Data in Tort Litigation: A Constitutional Argument, supra*, at 113.

## V. Conclusion

Reliance on "race"-based statistics in estimating life expectancy for purposes of calculating damages in this case is rejected in computing life expectancy and damages.

SO ORDERED.