ANNA MARIA WILLIAMS *v.* WALTON & WHANN CO.

*Proof of Marriage—Evidence—Negligence—Master and Servant—Damages.*

The evidence of any one present at the marriage ceremony is proper to go to the jury as proof of the marriage, and raises a presumption of marriage which is good till rebutted by contrary proof.

Reports made in the ordinary transaction of business, provided they are connected with the matters in issue, may be testified to; but mere conversations between subordinates and superiors are not admissible.

Negligence on the part of the employer must be proved and cannot be presumed.

When a a servant enters the employ of another he assumes all the risks ordinarily incident to the business and cannot recover for injuries resulting to him therefrom. Nor can he recover for injuries resulting from causes that are apparent to his senses.

If the servant be ignorant of a latent danger known to the master and the master place the servant at such work without warning him of the danger, the master will be guilty of negligence and liable for damages for injuries resulting therefrom.

The jury in awarding damages to the wife of the deceased should take into consideration losses passed and prospective.

(*New Castle, June 14, 1892.*)

ACTION on the case for damages for the death of plaintiff's husband caused by injuries incurred while in the employ of defendants. The facts appear in the opinion of the Court.

This case was first tried at the February term, 1892, at which trial, Benjamin Nields, for the defendants, offered strict legal proof of a marriage of Joshua Williams and Jane Tate prior to the marriage of Joshua to the plaintiff in this case.

*Lewis C. Vandegrift* called a witness (to the ceremony—not the officiating minister) on behalf of the plaintiff to prove marriage of the deceased prior to the marriage set up by the defendants, the woman to whom he was so married being alive and not divorced at

the time of the alleged marriage with Jane Tate, but who expired before he married the plaintiff.

*Mr. Nields* objected to the admission of this testimony on ground that these facts must be proved strictly by the record. As to what is strict proof, he cited 1 Houston, 332; *Pettyjohn v. Pettyjohn*, 5 Ecclesiastical Reports, 554; *Bishop on Marriage and Divorce*, 283–88.

*Mr. Vandegrift* replied: contending first that the celebration of the marriage may be proved by any person present; second, that the sufficiency of the celebration is presumed until the contrary is shown. *Myra Clark Gaines v. Patterson*, Supreme Court of the United States, in 6th Howard, 550; 10 East's Reports, 282; 14 Amer. Ency. of Law, 525, bottom paging (under which a number of cases were cited; among them was 10 N. Y. Reports, 480 to which special attention was called); 1 William Blackstone, 367, star paging; 61 Penna. State, 361; *Taylor v. Taylor*, 5 Ecclesiastical Report, 454; Laws of Delaware on Marriage; *McCaffrey v. Heritage*, 5 Houston.

*Vandegrift* and *Prickett*, for plaintiff.

*Benjamin Nields*, for defendant.

CULLEN, J.—The question that has been raised here is a very interesting one. It has been very fully argued and the court have carefully gone over the decisions which have been cited in this case and we feel, that under the circumstances, this evidence is properly admissible. We put it upon this ground: While an actual marriage must be proved in cases of " Crim. con.," adultery, bigamy, etc., in civil cases presumptions are sufficient of cohabitation, living together, passing as man and wife, etc. This is a civil case, but by common consent on both sides, it appears, as we understand, that you propose to prove an actual marriage. Now the question is, what in law constitutes an actual marriage? In order to ascertain that fact, we may go to cases, for instance, of " Crim. con.," or

cases of bigamy, and there it appears to be very clearly laid down in the authorities and decisions, so that it never appears really to have been questioned.

In the first authority here on this subject (Greenleaf on Evidence) the proof of marriage as one of the special issues is either by direct establishing the fact, or by the evidence of collateral facts and circumstances from which its existence may be inferred ; evidence of the former kind—that is, direct evidence, proving the formality, or what is equivalent to it—is required upon indictments for bigamy or in actions of " Crim. con.," it being necessary in such cases to prove a marriage valid in all respects—that is, proof of an actual marriage is required. *Russell on Crimes*, last edition, 316 (read). In cases of bigamy the actual marriage comes in and forms one of the direct issues, and therefore there must be a marriage in fact proved. Either some person present at the marriage must be called, or the original register, or an exact copy of the same must be produced. That is the common law provision. Then under 4th George, Chap. 76, Sec. 28 it is provided that marriages shall be solemnized in the presence of two or more witnesses, besides the minister who celebrates the same. But upon a provision nearly similar in a former marriage act, it was held not to be necessary to call one of the subscribing witnesses to the register, in order to prove the identity of the parties married ; but that the register or a copy of it being produced, any evidence which satisfied the jury as to the identity of the parties was sufficient. That is sustained by Fourth Burris, 2057 ;—Douglas, 164 (read). That appears to be the ruling of the English Courts on the marriage law, and such, I consider, is in force in this State.

After all, this testimony (which we think is admissible) is for the jury. It is for them to pass upon, as to whether or not they are satisfied with the testimony that goes in as establishing a marriage. I would say here that what we decide in this matter is only that this is proof to go to the jury.

There is a very interesting case in Sergeant ; it appears in the

English Ecclesiastical Reports. The law is not carried to the extent here that it is in England. There they have registers, such as de don't have in this country, and hence it has been customary in this country not to require that degree of strictness that is required in the English Ecclesiastical Court. That case is fully commented upon (and sustains this opinion) in one of the cases cited by Mr. Nields. There has been proof here that the man was an ordained minister; but really, so far as the law goes, it was not necessary to prove it any further than the fact from which the presumption arises, the presumption being in favor of marriage when you raise that presumption. For instance, the person was present at the marriage, it was celebrated by the minister, or by some man holding himself out and reputed to be a minister of the gospel: then that is a presumption, good until it is rebutted. Therefore, upon that proof being adduced, the case is open for the other side to show that this man had no right to celebrate the bans, and to rebut that presumption which has been raised.

We think, for these reasons, that it is perfectly competent for this testimony to go in.

The jury disagreed.

At the second trial, *Nields* for the defendant, inquired of the witness, John R. Bonner, superintendent of the defendant company, regarding verbal reports made to him by a deceased foreman, Mr. Smedley, acting under Bonner, as follows:

Did Mr. Smedley make any report to you on Tuesday in relation to his business that was necessary for you to know in connection with that business, and if so what was it, and is that the only way he made reports to you?

*Vandegrift* for plaintiff, objected to the question, under the previous ruling of the Court,—viz: that mere conversations with the deceased were not admissible—contending that the witness had himself shown that it was not a report, but a conversation in which he (the witness) inquired of Smedley as to the business, and that

the conversation was not volunteered by Smedley, and could not therefore be a report.

CULLEN, J., The Court rule in the reports that were made in the ordinary transaction of business, provided they are connected with the matters in issue, and can be recollected and stated by the witness; but we rule out all conversations that took place as between subordinates and superiors or any conversation with the party deceased, as hearsay evidence. If it was customary for the subordinates to go and report at any time in the day verbally, the witness if acquainted with what that report was, could testify as to it, but not as to any conversations he may elicit from questions asked by him during the progress of the work. He cannot speak as to any conversations commenced by himself.

CULLEN, J., charging the jury:

*Gentlemen of the Jury:* This action is brought by the plaintiff, Anna Maria Williams, widow of Joshua Williams, deceased, against Walton & Whann Company, a corporation existing under the laws of this State; the suit is founded upon the second section of the statute in the Revised Code, page 644, and is in these words: " Whenever death shall be occasioned by unlawful violence or negligence and no suit brought by the party injured to recover damages during his or her life, the widow of any deceased person, or, if there be no widow, the personal representative may maintain an action for and recover damages for the death thus occasioned. The plaintiff seeks to recover under the provisions of the said Act from the said defendants by reason of injuries received as alleged, by Joshua Williams, deceased, her husband, while in the employ of said defendants through their negligence.

It has been shown that the defendants as a corporation existing under the laws of this State, were at the time mentioned when the said grievance took place, engaged in the manufacture of phosphates, in the County of New Castle, near the City of Wilmington, for which purpose they had erected several buildings, covering with

their appurtenances a large space of ground, and that in the carrying on of said business, it became necessary to manufacture sulphuric acid in large quantities, since the same largely entered as a necessary ingredient into the phosphates by them manufactured. For the manufacture of said acid there was erected as a part of said works a large building (which communicated with several other buildings used for a like purpose) some fifty by twenty-five feet and about twenty-five feet high, the walls of which were lined with lead, and the floor covered with lead. By the burning of a substance called iron pyrites, the fumes from which connected with other chemicals were carried from the furnace by means of pipes or flues into the said chamber, and there coming into contact with steam which was also carried in like manner therein, sulphuric acid was thereby formed; that the manufacture of sulphuric acid by this process is the one usually adopted and recommended by the best writers on that subject; that in the manufacture of said acids, there would accumulate a sediment on the floor of said chamber of several inches in depth, which had to be removed from every three to five months, since that sediment if allowed to accumulate too long, would greatly impede the manufacture of said acid; that the defendants had been engaged for several years in thus manufacturing sulphuric acid, and the said chamber had as often as it became necessary been cleaned by their workmen, who with gum boots entered into said chamber and with wooden scrapers and shovels pushed out said deposit, through a hole cut in the floor, or in the sides of said chamber, and cleansing the residue by water thrown into said chamber by means of a hose; that this mode of removing said deposit of sediment, was the one used by other manufacturers of sulphuric acid, and recommended by standard writers on that subject; that until the happening of the injury charged, which occurred as alleged on the seventh day of January, 1890, no harm or injury had ever occurred to any of the men employed to clean said chambers; that several days prior to the removal of said sediment, and before the workmen entered into said chamber, the fur-

naces were shut down, and no fumes from the pyrites entered the chamber, and only steam was allowed to enter in small quantity which was in a short time cut off, when man-holes were cut in the sides, that all the noxious gases might pass out before the cleansing commenced.

The plaintiff contends that on Monday the 6th day of January, 1890, a number of men were ordered to clean out this chamber, and proceeded to do so, but were made sick, and on the following day, January 7th, about 10 o'clock, a. m., Joshua Williams, the said deceased, was ordered to assist with others in cleaning said chamber, upon which others had worked the day before, and in the discharge of that duty was made sick, and in consequence of said sickness about 11 o'clock of the night following died; that his death was caused by the inhaling of deadly gases whilst in said chamber; that the said Joshua Williams was a laborer in said works, assigned to no special duty aside from sweeping and other work he was called upon to discharge, and the said defendants placed him where he sustained the injury which caused his death, without warning him of the risk of which he was ignorant, it being of such a nature that defendants were bound to know, and were thereby guilty of negligence, such as in law can make them liable to the payment of damages to the plaintiff in this suit.

The defendants contend that there was no negligence or want of care or due diligence on their part, that the building used was safely and properly constructed, and in the manufacture of sulphuric acid they used the best methods, such as were recommended by scientific writers and accepted by all others engaged in the same business, and that the process used to cleanse out the chambers of the deposit therein was such as is recommended and practiced by all others to remove the deposit formed on the floor; that no injury in the work of cleaning said chambers, in which a like state of gases heretofore existed as on the said 6th and 7th of January, 1890, had ever before taken place; and that they having no knowledge, and never having had cause to believe or suppose a latent

danger existed, and having followed the ordinary usage of the business, were not guilty of negligence in not warning their workmen of what they themselves did not know, and that after hearing that workmen who went into the said chamber on Monday were made sick, it being the first time the fact was brought to their knowledge, the said Joshua Williams with others was especially warned not to enter the chamber, and not regarding said warning, was himself guilty of contributory negligence, for which these defendants contend they are not liable.

The law in relation to negligence, which is the sole matter in this case, has not only been well settled in the various States of this Country, but also in several decisions in our own State,—which we think amply and fully cover all the questions raised, so far as the law is concerned, as applicable to this case.   There really appears to be no dispute between counsel as to the law, and it is but necessary for us to state to you the law, and, taking the law as laid down by the court, you must decide the facts from the evidence as given by the witnesses, upon which this suit entirely depends.

The master is bound to exercise reasonable care to prevent injury to his servant, and in like manner to provide suitable machinery and keep the same in order and use proper care to see that the premises are not only fit and proper for the carrying on of the business, but also that they are kept so.   When a servant enters into the employ of another he assumes all the risks ordinarily incident to the business.   He is presumed to have contracted with reference to all the hazards and risks incident to the employment, consequently he cannot recover for injuries resulting to him therefrom.   There are risks and dangers incident to most employments, in all engagements of that character the servant assumes those risks that are incident to the service, and as between himself and the master he is supposed to have contracted on those terms.   If an injury is sustained by the servant in that service it is regarded as an accident, a mere casualty, and the misfortune must rest on him.   *Noyes v. Smith*, 28 Vermont, 29 ; *Seymour v. Maddox*, 16 A. & E. (Q. B.), 306.

The employer is not bound to employ the latest improvements in machinery, and is not liable for an injury which might have been avoided if such machinery had been in use. He is only bound to see that that which he does employ is safe and suitable. *State v. Patterson*, 6 Phila., Pa., 225; *Saltus v. Del. & Hudson Canal Co.*, 3 Ham. (N. Y.) 338; *Ford v. Fitchburg R. R. Co.*

When a servant is engaged in the work which is known as well to him as the master to be dangerous, unless there be negligence on the part of the master and the absence of rashness on the part of the servant, the master is not liable in consequence of an accident to the servant while in his employ. *Georgia R. R. Co. v. McDade*, 59 Ga., 73.

The master is bound to protect the servant from injury by reason of latent or unseen defects as far as reasonable care and foresight can accomplish that result, but he is not an insurer to the servant and is only chargeable when negligence can be properly imputed to him, but in the case of patent or obvious defects in the business, then the servant incurs the risk. *Toledo R. R. Co. v. Asbury*, 84 Ills., 429; 78 *N. C.*, 300.

Having thus stated the general principles of law in relation to master and servant which cover the prayers of the respective counsel in this case, and having heretofore stated the grounds on which the plaintiff claims the right to recover, as well as the defence set up on the part of the defendants, which you will bear in mind,— we will call your attention to other matters which you are to take into consideration.

Every case of this character must necessarily depend upon the facts. Though the principles of law are the same, yet the facts to which those principles of law are to apply depend entirely upon the evidence which is produced before the jury. This case depends upon the simple question of negligence upon the part of the defendants. That is, did they exercise ordinary care in sending the said Williams into the chamber to assist in cleaning the same, provided as contended by the plaintiff, deceased was not warned. So far as

this doctrine is concerned, the law does not presume negligence. If an action is brought by the servant against the master for recovery, the presumption is in favor of the master's having discharged his duty.     That being the presumption, before there can be a recovery, it must be proved to the satisfaction of the jury that there was negligence on the part of the master.     Negligence is defined to be a want of ordinary care for the protection of the servant, and for the providing of a proper place in which for him to work, and for the warning of him as against latent defects of which he was ignorant.     Such defects or dangers as are perceptible to the senses,—such as at once manifest themselves to the servant by their actual presence, are patent dangers, and the master is not liable for any injury that happens to the servant.     If the servant had been introduced into a service where were dangers not perceptible to the senses, and had not been warned of the dangers where his work necessarily led him, then the master would be responsible, because it is his duty to apprise him of all the latent dangers which he must necessarily encounter.     Latent dangers are those not seen, or perceptible to the senses by their presence, patent dangers are those seen or by their presence perceptible to the senses; and if the servant had been apprised of the latent dangers, not perceptible as aforesaid, then the master is not responsible.     This whole question, as before said, turns upon the matter of negligence.     That is a question which is to be determined from the facts which have been proved on the witness stand before you.     Were the defendants guilty of negligence in sending a servant in to do that work?     Supposing that he was an ignorant man, unacquainted with the nature and character of that work—does the evidence adduced here satisfy you that the defendants, in view of the law stated, without using proper care and diligence, sent Joshua Williams into that chamber from which his death ensued?     This question you are to decide.

If you are satisfied from the evidence offered in this case that Joshua Williams came to his death from inhaling the gases arising from the sediment in that chamber, and that there was negligence

or want of ordinary care on the part of the defendants, you should render your verdict in favor of the plaintiff. But in order to do that, you must be satisfied that there was a want of ordinary care; in other words, negligence on the part of the defendants in not warning Williams, not making him acquainted with dangers known to them, which plaintiff contends Williams had no means of knowing. Now if he had means of knowing as well as the master that there was danger there when he entered the service of the master, he accepts the risks, takes the responsibility, and has no right to recover. When Williams entered that chamber was there that present that showed him that he was in danger—admitting that the master sent him into it, for the time—then he was bound to use the senses nature had given him, and protect himself. Are the facts proved sufficient to satisfy you that Williams, without knowledge on his part, without being properly warned, went into this chamber, and thereby inhaled these gases to an extent that deprived him of life? If so, your verdict should be in favor of the plaintiff for such reasonable sum as you think proper. As regards the fixing of damages, should you find for the plaintiff, we cite for your guidance the law as laid down by this court in the case of *Parvis v. P., W. & B. R. R. Co.*, 17 Atlantic Reporter, 702 : " If the jury shall find a verdict for the plaintiff, then if she is entitled to damages, they are to estimate the reasonable probabilities of the life of the deceased, and give the plaintiff such pecuniary damages, not only for past losses, but for such prospective damages as the jury can find she has suffered or will suffer as the direct consequence of the death of said deceased." But if, on the contrary, you are satisfied from the evidence, that there was no negligence or want of ordinary care on the part of the defendants, that they had no reason to apprehend or suppose there was any latent danger from the fumes in this chamber, and had used the usual and ordinary means to purify and ventilate the same, and that Joshua Williams had knowledge of the risk and danger, and entered the chamber against the orders of the officer in charge, thus

causing contributory negligence on his part, or if you believe that the said Williams died from other causes, and not by injury incurred by inhaling the gases in said chamber, then your verdict should be in favor of the defendants. In other words, if you are satisfied from the testimony (and that is a matter entirely with you) that ordinary care was used by and on the part of the defendants and that it was not by any negligence on their part that death ensued by Williams going into the said chamber ; that said Williams was warned not to go into that chamber ; that by reason of the report circulating there where the deceased was at work on the bricks, of persons having been made sick, it came to his knowledge ; if you are satisfied from the evidence that he went in the chamber, was duly warned that he should come out, and afterwards went in,—there was a sufficient warning, and was contributory negligence on his part, and the defendants are not liable in this action.

As to the evidence in this case, 'tis for you to decide upon it, the court cannot assist you. There is conflicting testimony, and we can only refer you to a decision in our court, being the case of *Stewart v. The Philadelphia, Wilmington & Baltimore R. R. Co.*, 17 Atl. Reporter, 630 ; wherein the court say : " Now in this conflict of testimony the court can render you no aid in reaching a conclusion, except to say, that in all cases of conflict, where such diversity cannot be reconciled so as to make one consistant harmonious narrative of events testified to, it is the province and duty of the jury to institute a legal balance, and in it weigh the moral and legal value of the proof on both sides, and where the greatest weight or influence upon your minds and reason is there to that side to give your verdict. For after all, positive certainty in cases of discrepancy can rarely be attained, but only a controlling probability that the testimony on one side is reasonably to be considered to be true rather than that of the other."

Verdict for the plaintiff for $900.