CHARLES L. TERRY, SR., CHARLES L. TERRY, JR., and MAX TERRY, trading and doing business under the firm name and style of C. L. TERRY & SONS, *vs.* AMERICAN FRUIT GROWERS, INC., a corporation of the State of Delaware.

*(June 9, 1925.)*

HARRINGTON and RICHARDS, J. J., sitting.

*Henry Ridgely, Charles L. Terry, Jr.,* and *Howard E. Lynch, Jr.,* for plaintiffs.

*Herbert H. Ward* and *Thomas C. Frame* for defendant.

Superior Court for Kent County, April Term, 1925.

Case, No. 21, February Term, 1924.

500

HARRINGTON, J. The objection is overruled. With respect to the first ground, the witness has testified that he received the proceeds from the sale of each car of apples sold by the plaintiffs and entered the amounts so received in his books at the time; that any testimony that he may give in response to the question, in case his present recollection shall be revived by his books, will not violate the hearsay rule is, therefore, clear.

With respect to the second ground, the question is not whether the account books of the plaintiffs, in which transactions with third persons are recorded, are admissible in evidence against the defendant company either under the shop book rule or under the regular entry rule, but whether the witness who made the entries in such books at the time the transactions took place, and who then knew the facts upon which they were based can refresh his memory from such entries. That he can do so seems beyond question. *Fitzgibbon's Adm'r v. Kinney*, 3 *Harr.* 317; *Redden v. Spruance*, 4 *Harr.* 265; *Modern Machinery Co. v. Perkins*, 3 *Boyce* 127, 80 *A.* 1060[1]; *Curry v. Warner Co.*, 2 *Marv.* 98, 42 *A.* 425; *Stephens' Digest on Evidence*, 341; *Greenleaf on Evidence*, § 437; *Wigmore on Evidence*, §§ 758, 761. See, also, *Remington Machine Co. v. Wilmington Candy Co.*, 6 *Penn.* 288, 66 *A.* 465; *State v. Brooks*, 3 *Boyce* 206, 84 *A.* 225.

[1]In *Modern Machinery Co. v. Perkins*, 3 *Boyce* 127, 80 *A.* 1060, cited in the above case, certain workmen, employed by the plaintiff, made entries at the time and in the usual course of business on cards with respect to the labor done on and materials furnished for certain air pumps then being built by the plaintiff company for the defendant; the witness then took these cards and entered the data appearing thereon on the paper from which he sought to refresh

■ Charles L. Terry, Sr., one of the plaintiffs, testified on recall in direct examination, in part, as follows, by Mr. Ridgely:

"Q. Why were none of these apples (referring to the 31 cars rejected by the defendant company) sold in Wyoming, Delaware?

"A. I had no market. I couldn't sell there.

"Q. There was no market at Wyoming, Delaware, for these apples?

"A. No, sir; there was none.

"Q. You heard the testimony as to the various places where these apples were sold?

"A. Yes, sir.

"Q. Were you in touch with the market for apples in July, 1923?

"A. Yes, sir. I kept in daily touch with the whole country on apples. I had to.

"Q. That was a part of your business?

"A. It was.

"Q. Why did you sell these apples at the various points testified to?

"A. Because I could get more money out of them that way. I put them where they would bring the most money.   *   *   *

"Q. Were the prices you received for those apples the current market prices at the time of the sale in the Eastern apple markets?

"A. Yes, sir; for those varieties of apples.

"Q. Was there any reason why you sold those apples at different places?

"A. It would have been suicide to have put them all in one market. I sold them so as to keep from glutting any market. Distribution is the greatest thing in handling fruit.

"Q. What about the prices of apples in July, 1923, at Pittsburgh, New York and Boston?

"A. They are the centers of apples in the East.

his recollection. The defendants objected to the use of the paper for that purpose presumably on the ground that the witness did not have such information as would permit him to testify as to the details appearing on said paper.

The court, however, overruled the objection, though there is nothing to show that the parties who made the entries on the cards were called as witnesses.

See *Remington Machine Co. v. Wilmington Candy Co.*, 6 *Penn.* 288, 66 *A.* 465; *Wigmore on Evidence*, §§ 751,752, 1529, 1530, 1555; *Chamberlayne's Handbook on Evidence*, §§ 918, 979; *Ency. of Evidence, vol.* 5, *p.* 259; *Smith's Leading Cases, vol.* 1, *part* 1, *p.* 566, etc.

See, also, *Williams v. Walton & Whann Co.*, 9 *Houst.* 322, 32 *A.* 726, where the Court, applying the so-called regular entry rule, admitted a verbal report made in the usual course of business by a deceased foreman to the superintendent of the plant. This principle is, also, discussed in *Chamberlayne's Handbook on Evidence*, § 922. That the death of the entrant is not necessary in order to make regular entries admissible in evidence, see *Redden v. Spruance*, 4 *Harr.* 265; *Remington Machine Co. v. Wilmington Candy Co.*, 6 *Penn.* 288, 66 *A.* 465.

"Q. Is there any difference due to the number of apples on hand?

"A. Yes, sir. Too many apples drop the market.

"Q. While there is a market which indicates the market price at a particular point, nevertheless if that market has more than its needs sent to it, the market falls?

"A. Yes, sir.

"Q. I think you have already stated that you were in July, 1923, in daily touch with the current Eastern markets for apples of the kind, variety and quality called for by the contracts in this suit?

"A. Yes, sir.

"Q. When you received the proceeds from the sale of the 31 cars of apples, which were refused by the defendant company, did you compare the amounts received with the then current market prices of apples of the kind, condition, and quality called for by the contracts in this suit?"

Ward, attorney for the defendant company, objected to the question on the ground that it did not appear what criterion was used by the witness in comparing prices, and that if he had any information with respect to market prices, that it did not appear how he acquired it.

HARRINGTON, J. We overrule the objection. The witness has stated that he was familiar with the current market prices of apples of the kind and quality in question during the period inquired about. Whether he had such information is a matter to be ascertained by cross-examination.

At the conclusion of the testimony of the witness, Ward, attorney for the defendant company, requested the Court to strike out all of the testimony introduced by the plaintiffs, with reference to the sale by them of the 31 cars of apples in foreign markets.

In support of this motion, he contended that when a buyer repudiated a contract for the sale of personal property, and refused to accept such property, the measure of damages was the difference between the contract price and the market price of such property at the time and place of delivery specified in the contract. He further contended that the contract in this case provided for the delivery of the apples in question and for payment therefor at Wyoming, and as it appeared from the testimony of the witness that there was a fruit market at that place in order for the plaintiffs to fix their damages by selling the 31 rejected cars, it was nec-

essary for them to show that they sold such apples at Wyoming. He cited 35 *Cyc.* 592; *Sedgwick on Damages, vol.* 2 (9th Ed.), § 738, *p.* 1543; *Williston on Contracts, vol.* 3, § 1378, *p.* 2452; *Leonard & Co. v. Johnson Forge Co.,* 3 *Penn.* 104, 50 *A.* 541; *Love v. Barnesville Mfg. Co.,* 3 *Penn.* 152, 50 *A.* 536.

HARRINGTON, J. Assuming that to be the rule, if no loss was suffered by the defendant company, does your contention still apply?

Mr. Ward: I think so and we would have had to take our losses if plaintiffs had sold at Wyoming.

RICHARDS, J. Do you contend that even if the plaintiff knew that he could sell the apples for more money in another market he should, nevertheless, have sold them at Wyoming?

Mr. Ward: Yes, sir.

The attorneys for the plaintiffs admitted the general rule stated by the attorney for the defendant company, but contended that it did not apply where the plaintiffs established their damages by a resale of the rejected property.

They contended that in such cases they were merely required to use good faith and reasonable care in trying to establish the damages suffered by them, and that if these rules were not violated it did not matter where the resale took place.

In support of this contention, they cited *Sutherland on Damages* (3d Ed.), *vol.* 3, *pp.* 1862, 1863; *White Walnut Coal Co. v. Crescent Coal & Mining Co.,* 254 *Ill.* 368, 98 *N. E.* 669; *Sleepy Eye Milling Co. v. Hartman & Son,* 184 *Ill. App.* 308, 312; *Baber v. C., C., C. & St. Louis R. Co.,* 176 *Ill. App.* 486; *Lewis & Cobb v. Greider,* 49 *Barb.* (*N. Y.*) 606; *Merrill v. Tew,* 183 *N. C.* 172, 110 *S. E.* 850, 852; *Guthrie Mill & Elevator Co. v. Thompson & Gibson,* 89 *Okl.* 173, 214 *P.* 716.

HARRINGTON, J. The evidence produced by the plaintiffs tends to show that the defendant company in violation of its contract refused to accept 31 cars of apples tendered to it and that such cars were thereupon sold by the plaintiffs at various places in the Eastern fruit markets.

If the defendant violated its contract, that the plaintiffs had a right to establish their damages by a sale of the rejected cars at the risk and for the account of the defendant company is not denied. *Barry v. Logan*, 5 *Harr.* 52; *Quaker Metal Co. v. Standard Tank Car. Co.*, 2 *W. W. Harr.* (32 *Del.*) 350, 123 *A.* 131.

■■ It appears from the authorities cited by the plaintiffs that under such circumstances all that was required of the plaintiffs in making such sale was the exercise of good faith and reasonable care in attempting to sell the cars in question at the best possible price.

That being true, they were not bound to sell at the town of Wyoming, even though there was a fruit market at that place and though that was the place of delivery provided for in the contract. There is also testimony that the plaintiffs could not have sold the fruit in question at Wyoming.

We therefore overrule the defendant's motion to strike out the testimony in question.

■■ Frank H. Thomas, a witness produced by the defendant company, after testifying that there was a buyers' fruit market at Wyoming, Delaware, during the month of July, 1923; that he was a broker in that market at that time; that he kept a record of his transactions in that market during that month at the time they took place; and that while such entries were not made by him that they were made by his wife, acting as his bookkeeper according to his directions, was then asked:

"Did you make a memorandum from your books relating to your transactions as a fruit broker during the month of July, 1923?"

On the witness answering this question in the affirmative, he was then asked:

"Using this memorandum to refresh your memory, will you state what the market price of Red Astrachan apples No. 1 quality, carload lots, was in the buyers' market at Wyoming, Delaware, on July 18, 1923?"

Ridgely, attorney for plaintiffs, objected on the ground that the witness could only refresh his memory from the original entries and not from a memorandum copied therefrom.

HARRINGTON, J. When a book, or other writing, is used to

refresh or revive the present memory of the witness[2], under the common-law rule it is his testimony, and not the written memorandum used, that constitutes the evidence that goes before the jury. *Fitzgibbon's Adm'r v. Kinney*, 3 *Harr.* 317, 319; *Erie Preserving Co. v. Miller*, 52 *Conn.* 445, 52 *Am. Rep.* 607; *Stephens' Digest on Evidence*, 341; *Wigmore on Evidence*, §§ 762, 763.

[2]Stephens' Digest on Evidence, *p* 341, divides cases of refreshing memory into three groups or classes:

1. Where the witness, by referring to the writing, is enabled to actually recollect the facts and can testify in reality from memory.

2. Where the witness, after referring to the writing, does not recollect the facts and yet remembers that he made or saw the writing when the facts were fresh in his mind, and that he then stated the facts correctly.

3. Where the witness, after referring to the writing, neither recollects the facts nor remembers having seen it before, and yet from seeing his handwriting therein (as in signature, contents, or both) is enabled to testify to its genuineness and correctness.

*Greenleaf on Evidence*, § 437, and *Jones on Evidence*, § 875, adopt the same classifications, but the Supreme Court of this state, in *Remington Machine Co. v. Wilmington Candy Co.*, 6 *Penn.* 288, 301, 66 *A.* 465, 469, in discussing this question, said:

"In those jurisidictions, where such entries can only be used, during the life of the entrant, to refresh his memory, whether they do in fact or not, both Mr. Greenleaf and Mr. Chase (the latter in his edition of Stephens' on Evidence) divide the cases into three classes. In the case of *Davis v. Field*, 56 *Vt.* 426, it is said: 'There seem to be two classes of cases on this subject. 1. Where the witness, by referring to the memorandum, has his memory quickened and refreshed thereby, so that he is enabled to swear to actual recollection; 2. Where the witness, after referring to the memorandum, undertakes to swear to the fact, yet not because he remembers it, but because of his confidence in the correctness of his memorandum. In both cases, the oath of the witness is the primary, substantive evidence relied upon; in the former the oath being grounded on actual recollection, and in the latter on the faith reposed in the verity of the memorandum.'"

Wigmore on Evidence, however, adopts a very different classification. He classifies cases that would correspond to class 1 of Stephens' Digest as present recollection revived (*sections* 758 to 764, inclusive) and cases that would correspond to classes 2 and 3 of Stephens' Digest as past recollection recorded (*sections* 734 to 754, inclusive.)

Under his second classification the memorandum is treated as adopted by the witness and as composing an essential part of his testimony; by reason of that fact it seems to be admitted in evidence or is, at least, read to the jury. Wigmore on Ev., § 754; Greenleaf on Ev., § 437, note 2. This rule is supported by numerous American cases, but Greenleaf on Ev., § 437, note 2, calls attention to the fact that such was not the common-law rule. See, also, the note to *Price v. Lord Torrington*, *in* Smiths' Leading Cases, *vol.* 1, part 1, *pp.* 563, 573,

That being true, if the memory of the witness is revived thereby, the mere fact that the entry was made by another person does not affect its use for that purpose. *Barr v. Logan*, 5 *Harr*. 52; *Greenleaf on Evidence*, § 436; *Wigmore on Evidence*, §§ 758, 759; *Jones on Evidence*, § 877; *Stephens' Digest on Evidence*, p. 341, etc.

etc. While Wigmore was not referred to his rule seems to have been adopted by the Supreme Court of this state in *Remington Machine Co. v. Wilmington Candy Co.*, 6 *Penn.* 288, 66 *A*. 465, *supra*. In that case, the question was whether slips of paper, containing certain entries, made by the bookkeeper of the defendant, had been properly admitted in evidence by the trial court. In considering this question the Court apparently considered and applied both the regular entry rule and the past recollection recorded rule.

The same general principle seems, also, to have been applied in this state in *State v. Rash*, 2 *Boyce* 77, 78 *A*. 405, though *Remington Machine Co. v. Wilmington Candy Co.* does not appear to have been called to the Court's attention.

In that case the testimony of Rash was taken under oath by a stenographer before Judge Richards, who was then Deputy Attorney General for Sussex county. Rash, as a witness for the state in a criminal case before the Court, subsequently repudiated and denied this testimony. He was later tried and convicted for perjury. Both the stenographer who took his testimony before the Deputy Attorney General and the court stenographer, who took his testimony when called as a witness by the state at the trial in the Court of General Sessions, testified against him in the perjury case. Both stenographers produced their original notes and were not only permitted over the objection of Rash's attorney to testify from typewritten transcripts of Rash's testimony previously taken by them, but such transcripts were, also, admitted in evidence. This case, also, would therefore seem to be an example of the application of *sections* 736 and 737 of Wigmore on Evidence. As a matter of fact, Wigmore also cites *Redden v. Spruance*, 4 *Harr*. 265, as supporting this principle. Wigmore on Ev., § 736, note. See, also, *section* 737.

With respect to the time when entries merely used to refresh or revive the present recollection of the witness must have been made, this Court in *Redden v. Spruance*, 4 *Harr*. 265, said that such entries must be made "at or about the time of the transaction, and where the witness remembers that at the time they were made he knew them to be correct and true."

While numerous cases use somewhat similar language, the exact time necessary for the entry to be made in order to be usable for this purpose is not definitely settled by the authorities in general. *Greenleaf on Ev.* § 438; *Jones on Ev.*, §§ 341, 342; *Wigmore on Ev.*, § 761; *Stephens' Digest on Ev.*, 344 note.

Probably the better rule would be merely to require such entries to be made at a time when it would be reasonable to assume that the facts were fresh in the minds of the witness (*Coffin v. Vincent*, 12 *Cush.* [*Mass.*] 98; see *Wigmore on Ev.*, § 761; *Greenleaf on Ev.*, § 438) and it may be questioned whether *Redden v. Spruance* meant anything more than that.

So far as I am able to find, in addition to *Redden v. Spruance*, the only reported case in this state having any special bearing on this particular question is *State v. Rhodes*, *Houst. Cr. Cas.* 476. In that case, the court refused to permit a witness for the state to refresh his memory from the written transcript

See, also, *Rogers v. Fenimore,* not officially reported, but published in *(Del. Super.)* 41 *A.* 886, where the plaintiff was permitted to refresh his memory as to the market price of wheat on a certain day from a printed price current list which had been shown to be authentic.

It, also, naturally follows that a copy made by the witness from book entries originally made by him, or under his direction, may ordinarily be used for the same purpose. *Curry v. Warner Co.,* 2 *Marv.* 98, 42 *A.* 425; *Doe v. Perkins,* 3 *T. R.* 749; *Commonwealth v. Ford,* 130 *Mass.* 64, 39 *Am. Rep.* 426; *Folsom v. Apple River Log Driving Co.,* 41 *Wis.* 602; *Bonnet v. Glattfeldt,* 120 *Ill.* 166, 11 *N. E.* 250; *Greenleaf on Ev.,* § 436; *Wigmore on Ev.,* § 760; *Stephens' Digest on Ev.,* 341.

In *Fitzgibbons' Adm'r v. Kinney,* 3 *Harr.* 317, *supra,* the Court, referring to the right of a witness to refresh his memory said:

"He may look at the books to refresh his memory, but for nothing else; and unless, after looking on the books, he can swear to the sale and delivery of each article from his own recollection, now refreshed by the books, the evidence is not sufficient proof."

In the later case of *Redden v. Spruance,* 4 *Harr.* 265, the Court, however, said:

"The general rule of evidence is not questioned, that the witness must swear to facts within his own knowledge, though his memory may be refreshed, and his knowledge verified, by reference to written memorandums. Fur-

---

of the testimony previously given by him at the coroner's inquest in the same case. It does not appear when the inquest was held but the crime charged was committed on the 21st day of April, and the trial was at the May term. The court merely stated that the case did not come "within the letter of the rule governing such applications" and that in such a case they would not extend the rule. *Redden v. Spruance* was not referred to and if the ruling was based on the fact that the testimony before the inquest was not given or taken in writing at or about the time the matters testified to took place, it applied the rule with considerable strictness.

To permit the adoption of a written memorandum as a part of the testimony of a witness under the past recollection recorded rule, it is evident that greater strictness with respect to the proximity of the making of the memorandum to the happening of the act or event recorded would be required than in cases when the witness testifies from his own memory, though revived or aided by such memorandum. Wigmore on Ev., §§ 745, 761.

While there may be occasional cases under this rule, where the use of a copy of the memorandum will be permitted, the original must ordinarily be produced and used. Wigmore on Ev., §§ 749, 750.

ther than this, the memorandum or writing cannot be used; except in cases where it was made in the usual course of business as evidence of the fact to be proved; as in book entries, notes of presentment, protest, etc.; or where it is made with the knowledge and concurrence of the party to be charged, for the purpose of charging him; or where the verification of the writing itself establishes the fact to be proved, as in the case of the attestation of solemn instruments. So where the question was whether a bill of exchange had passed through" the bookkeeper's hands, the "clerk was allowed to prove his own writing on it, though he did not recollect it. Also, with regard to inventories and schedules; precise dates; particular words, and other matters which the memory would not be likely to retain, *a greater liberty of reference has been allowed.* * * * This seems to be carrying the principle of substituting memorandums for the sworn recollection of witnesses far enough."

See, also, *Greenleaf on Ev.*, § 437 (note C).

After the above quotation from the Harrington Case, the Court referred to the regular entry rule and then added, "Other entries may be used to refresh the memory but are not admissible in evidence."

It is true that a copy of a book account, relied on as such, even though the original may have been accidentally destroyed, is not admissible in evidence, but that rule is based on an entirely different principle. *Fitzgibbons' Adm'r v. Kinney*, 3 *Harr.* 317; *Bunting v. White*, 3 *Houst.* 551.

Whether the rule as to refreshing memory stated in the above cases has been in any way changed by the *Remington Machine Co Case*, 6 *Penn.* 288, 66 *A*. 465, need not be considered in this case.

The right of the opposite party to cross-examine the witness on the sufficiency and accuracy of the copy of the book entries produced and used by him in court for the purpose of refreshing his memory is clear. *Jones on Ev.*, § 876; *Greenleaf on Ev.*, § 466; *Stephens' Digest on Ev.*, § 343; 21 *A. L. R.* 658; *Wigmore on Ev.*, § 762.

Whether the witness, on request of the opposite party, may be required to produce his original memorandum, from which the copy was made, for inspection and cross-examination or whether his failure to do so, under such circumstances, without a good and sufficient reason, would merely affect his credibility, need not be considered by us, as no such demand was made in this case. This question was, however, considered by the following authorities: *Davie v. Jones*, 68 *Me.* 393; *Calloway v. Warner*, 77 *Ala.* 541, 54

*Am. Rep.* 78; *Doyle v. Ill. Cent. R. Co.*, 113 *Ill. App.* 532; 11 *Ency. of Ev.*, 124, 131. See, also, *Stephens' Digest on Ev.*, 343; *Greenleaf on Ev.*, § 437; *Wigmore on Ev.*, §§ 762, 764; *Jones on Ev.*, 876; *Loose v. State*, 120 *Wis.* 115, 97 *N. W.* 526.

HARRINGTON, J., charged the jury in accordance with the rule laid down in *Leonard v. Johnson Forge Co.*, 3 *Penn.* 104, 50 *A.* 541, as to the effect of a repudiation of the terms of a contract and the effect of a mere failure to pay stipulated amounts in accordance with its terms without any intent to repudiate such contract. He also charged on the law of recoupment.

He further charged the jury, in part, as follows:

The contract in question provides that the apples sold shall be loaded f. o. b. cars, Wyoming. It further provides:

"The purchaser agrees that as each car is loaded and bill of lading and manifest of the number of packages of each grade contained in the car is presented, to pay for same on the basis of the price above specified for the particular varieties."

The obligation of the seller, under such contract, is to properly pick and gather the apples to be delivered under this contract when same are in proper shape and condition; to use proper precaution to prevent bruising or injury to said fruit at all times; and to carefully and properly pack said fruit in standard bushel baskets with a good bulge pack, ring faced. The No. 1 Transparents to be packed 2 inches and up; the Williams Red 2¼ inches and up.

The contract further stipulates that:

"The fruit to be delivered under this contract is to be free from scab, worm holes, hail pecks, or mechanical injuries."

While it appears that the contract contains no express provision as to inspection before acceptance and payment, the plaintiffs, nevertheless, contend that an inspection at the place of delivery, namely, at Wyoming, Delaware, is necessarily implied. In support of this contention, they cite 2 *Williston on Sales*, § 480.

From an examination of the chapter and section cited, it is apparent that the question discussed is as to when "title" passes under a contract of sale. If that were the question before this

Court, there might be some force in the plaintiff's contention; certainly, if inspection had been expressly provided for.

But even where a question of title is involved, *Williston on Sales*, *at page* 1233, § 472, says:

"If the property has not passed prior to inspection, the buyer has the power to refuse to take title. But if there was a contract by which the buyer had agreed to take goods of the kind and quality of those tendered, he will be liable if he refuses the tender, and conversely the seller will be liable if he fails to furnish such goods. Not only inspection but acceptance in the situation under discussion is a condition precedent to the transfer of ownership but not to liability on the contract" (citing *N. P. Sloan Corp. v. Linton*, 260 *Pa.* 569, 103 *A.* 1011, 6 *A. L. R.* 633).

And even with respect to such contracts, in *section* 479, *p.* 1247, the same author also says:

"Often it is true, inspection is expressly provided for. Even if it is not, though the buyer must pay the price before inspection, if the goods do not conform to the contract the buyer clearly may recover the price which he has paid."

And on page 1250 of the same section, Mr. Williston says:

"Other forms of bargains may indicate by the time agreed upon for payment of the price or otherwise that an inspection of goods was not to be a condition precedent either to the transfer of the property or to the payment of the price."

But, however that may be, the question before this Court is purely one of performance or nonperformance of the terms of the contracts sued on, and not as to when title to the apples passed to the buyer or when the contract price was due; that being true, we cannot instruct you as a matter of law, as requested by the plaintiffs, that the defendant waived the right to raise any question as to full performance by the plaintiffs, of the obligations assumed by them in such contracts, with respect to any shipments prior to the 13 cars not paid for.

██ Whether, however, by billing out and paying for such fruit the defendant intended to waive any objections thereto, if any there were, and to accept the same as being in full compliance with the terms of the contract, is one of the questions of fact for you to determine.

██ Where there is a breach of a contract for the sale of personal property the usual rule for measuring damages is the differ-

ence between the contract price and the market price of the commodity in question at the time and place of delivery specified in the contract. *Leonard & Co. v. Johnson Forge Co., Penn.* 3 104, 50 *A.* 541; *Love v. Barnesville Mfg. Co.,* 3 *Penn.* 152, 50 *A.* 536; *Barr v. Logan,* 5 *Harr.* 52.

When, however, the buyer refuses to accept such property in the absence of a clause in the contract prohibiting it, the seller may, if he prefers, establish his damages by a resale of the rejected property for the account of the defaulting buyer. *Quaker Metal Co. v. Standard Tank Car Co.,* 2 *W. W. Harr.* (32. Del.) 350, 123 *A.* 131; *Barr v. Logan,* 5 *Harr.* 52; *Williston on Sales* (2d Ed.), § 559. When this plan is adopted, a sale at the place of delivery is not necessarily essential.

In *White Walnut Coal Co. v. Crescent Coal & Mining Co.,* 254 *Ill.* 368, 375, 98 *N. E.* 669 *at page* 671, the Court said, quoting from Mechem on Sales, par. 1638:

"With respect to the place at which the resale should be made, no hard and fast rule can be laid down. A particular place is not to be insisted upon, but good faith and a fair and reasonable endeavor to get the best available price for the goods are essential. The place at which the buyer was to receive the goods is not necessarily the best place for the resale; neither is the nearest market, or even a market within the state, necessarily the most appropriate. Regard must be had for the character of the goods and the time, circumstances, and places that regulate and control prices."

In *Sleepy Eye Milling Co. v. Hartman, et al.,* 184 *Ill. App.* 308, the contract was for the purchase of flour to be delivered at Springfield, Ill. The seller resold the flour at other places than Springfield. The purchaser insisted that the seller had no right to do this, and showed that a better price for the flour could have been secured if the resale had been at Springfield, the place of the delivery under the contract. Nevertheless, the Court, at page 312, said:

"After defendants had refused to accept or receive this flour it then became the duty of the plaintiff to resell it, and they were not, in so doing, confined to the market at Springfield, even though the flour might have been sold for a greater sum in the city of Springfield than it did at the points where plaintiff shipped it, unless such reshipment and sale was done with the intention of injuring the defendants or with the knowledge that by making sales at other places, a less price would be received."

In the case of a resale of rejected property, the measure of damages is, therefore, the difference between the contract price of the article sold and the price which the seller received on a resale of the same after the breach of the contract by the purchaser, where the seller made the resale in good faith, and made a fair and reasonable effort to procure the best possible price.

Verdict for plaintiffs for the full amount of their claim.